[Sac. No. 2332.    In Bank.—September 11, 1917.]

## SILVER LAKE POWER AND IRRIGATION COMPANY (a Corporation), Respondent, v. CITY OF LOS ANGELES, Appellant.

WATER RIGHTS — APPROPRIATION ON UNITED STATES LANDS — RIGHTS OF LOCATOR AND APPROPRIATOR.—As against all the world but the United States, one who locates and appropriates water on United States lands acquires a possessory right to continue with the prosecution of the necessary work until completion. Possession accompanied by work and the avowed intent to prosecute the work adequately gives him a conditional right to the future use of the water prior to its actual use, the condition being that he shall thereafter diligently continue the work to completion and then divert the water and apply it to a useful purpose, failing which his right will cease; but until the completion of the work, no title, legal or equitable, vests in the appropriator as against the paramount authority of the United States.

ID.—EFFECT OF WITHDRAWALS BY UNITED STATES—RIGHTS OF APPROPRIATORS DESTROYED.—When the United States government withdraws waters from the right of private appropriation, the rights of appropriators acquired prior to such withdrawal are destroyed and not merely suspended, and are not revived by subsequent vacation of the withdrawal orders as against a grant by Congress of the same waters, made during the time the withdrawal order was in force.

APPEAL from a judgment of the Superior Court of Mono County, and from an order denying a new trial. J. D. Murphy, Judge.

The facts are stated in the opinion of the court.

Albert Lee Stephens, City Attorney of Los Angeles, W. B. Mathews, Richard S. Miner, and S. B. Robinson, for Appellant.

John R. Dixon, and Newman Jones, for Respondent.

HENSHAW, J.—Respondent's predecessors in interest first conceived the plan of utilizing the waters of Owens River and of Rock Creek, one of its tributaries, for irrigation and for the development of hydro-electric energy. They made

locations upon the river and creek for these purposes. They began their work under these locations and they prosecuted this work until it was interrupted and suspended by withdrawal orders of the government of the United States. Under the compulsion of these withdrawal orders the predecessors in interest of respondent ceased work. These withdrawal orders were temporary in character and made in conformity with the law in contemplation that the United States government might itself impound these waters and devote them to purposes of irrigation for the benefit of the valley lands lying under them. This contemplated reclamation scheme of the federal government was abandoned. Before the formal order of abandonment was actually made it became apparent that the government would not proceed with its plan, and respondent's predecessors in interest resumed work. The work which they did before the withdrawal of these lands by the government was performed at least two years before the city of Los Angeles ever contemplated using the water of Owens River or of its tributary, Rock Creek, for any purpose whatsoever. During the period of time when the lands lay under the orders of withdrawal, Congress passed a certain act, giving the city of Los Angeles, upon conditions, a preferential right to purchase some of the withdrawn lands. The orders of withdrawal, to which reference has been made, were, first, the order of July 24 and 27, 1903, under which all the lands on which the notices of appropriation by respondent's predecessors in interest had been posted were temporarily withdrawn, together with large tracts of land for use as a reservoir site in connection with the contemplated government project. On August 24 and 25, 1903, all the lands upon which it was proposed by respondent's predecessors in interest to put the water for agricultural purposes were temporarily withdrawn from all forms of entry except homestead. On January 1, 1905, all the lands in the Owens River gorge, which lands lie below the proposed reservoir site, were likewise withdrawn for use in connection with the government project. These orders of withdrawal were formally vacated on July 12, 1907.

Before June 30, 1906, but long after the initiation by posting and recording of the rights of plaintiff's predecessors in interest, and long after their first work under those rights had actually been prosecuted, the city of Los Angeles con-

ceived the idea of devoting to its own uses for municipal purposes the waters of Owens River. On the last-mentioned date, and during the period of the operation of the orders of withdrawal above referred to, Congress passed an act (Act Cong. June 30, 1906, c. 3926; 34 U. S. Stats. at Large, p. 801), granting to the city of Los Angeles necessary rights of way over the public lands in certain named counties "for the purpose of constructing, operating and maintaining canals," etc.; in short, for all legitimate purposes in connection with the proposed conduct of the water of Owens River to the city of Los Angeles, and for the additional purpose of maintaining power and electric plants. This grant was to take effect "whenever said city shall have filed, as hereinafter provided, and the same shall have been approved by the Secretary of the Interior, a map or maps showing the boundaries, locations and extent of said proposed rights of way." [Section 1.] It was required that the city should file such maps within one year after the passage of the act, and should do no work until the maps had been filed and approved. The rights of way thus tendered by grant were declared not to be effective "over any land upon which homestead, mining or other existing valid claims had been filed or made until the city of Los Angeles shall have acquired title thereto and made just compensation therefor." Still further, and with particularity, it was declared that the act should not "affect the adjudication of any pending applications for rights of way by the owner or owners of existing water rights, and that no private right, title, interest or claim of any person, persons or corporation in or to any of the lands traversed by or embraced in said right of way shall be interfered with or abridged." [Section 3.] Also the act declared: "That in the event that the Secretary of the Interior shall abandon the project known as the Owens river project for the irrigation of lands in Inyo county, California, under the act of June seventeenth, nineteen hundred and two, the city of Los Angeles, in said State, is to pay to the Secretary of the Interior, for the account of the reclamation fund established by said act, the amount expended for preliminary surveys, examinations and river measurements, not exceeding fourteen thousand dollars, and in consideration of said payment the said city of Los Angeles is to have the benefit of the use of the maps and field notes resulting from said surveys, examinations, and river measurements, and the preference

right to acquire at any time within three years from the approval of this act any lands now reserved by the United States under the terms of said reclamation act in connection with said project, necessary for storage or right of way purposes, upon filing with the register and receiver of the land office in the land district where any such lands sought to be acquired are situated a map showing the lands desired to be acquired, and upon the approval of said map or maps by the Secretary of the Interior and upon the payment of one dollar and twenty-five cents per acre to the receiver of said land office title to said land so reserved and filed on shall vest in said city of Los Angeles.'' [Section 4.]

It was the language of this act, with other circumstances not necessary to particularize, which conveyed the knowledge that the government would abandon its proposed reclamation project. Thereupon respondent's predecessors in interest in June, 1906, resumed work under their notices and continued this work (interrupted only by the snows of winter) until shortly after the commencement of this action on July 15, 1907. At that time there was in the codes of this state a section (Civ. Code, sec. 1416) providing in effect that where litigation becomes necessary under such enterprises as this to acquire land or rights, ''then the party so appropriating, or his assigns, shall have sixty days after the determination of legal proceedings by final judgment in which to commence to excavate or construct the works in which he intends to divert the water.'' Respondent and its representatives ceased work under the guaranty of protection extended by this law. Its provisions in this regard, however, were repealed, at least by implication, by section 4 of the Water Power Act of April 8, 1911 (Stats. 1911, p. 813). Following the passage of this act, on or about August 1, 1911, respondent resumed work and continued this work until the date of the trial of this action. This latter work was in part actual construction work and in part was surveying.

In the action which it brought, this respondent set up its asserted rights to the waters of these streams for the purpose of irrigation as well as for the purpose of developing hydroelectric energy. In this another corporation was interested. There resulted a tripartite agreement between the city and respondent and the third corporation, under which the asserted right to the use of the water for purposes of irri-

gation was abandoned and those rights conveyed to the city of Los Angeles, leaving in issue the question whose was the right to use these waters for the generation of electricity. With the litigation thus restricted trial was had before a jury, to which twelve special questions were submitted. One and all the jury's answers favored this plaintiff's contentions. The court adopted them and incorporated them into the findings which it made. Upon these findings and the legal conclusions drawn therefrom it gave judgment for plaintiff, and the defendant has appealed from that judgment and from the order denying its motion for a new trial.

This statement, incomplete in itself, is designed only as an aid to an understanding of the single question necessary to be considered on this appeal. That question may be thus stated: *What effect upon the original appropriators' rights was worked by the executive orders of withdrawal and the act of Congress operating with the laws of this state?*

As its answer necessitates the construction of federal laws, the interpretation which the United States has put upon those laws is of all-controlling force. The federal law under which the original locators were admittedly acting is that found in section 2339 of the Revised Statutes of the United States, approved July 26, 1866, [U. S. Comp. Stats. 1916, sec. 4647]. Notwithstanding its familiarity, it may be well to quote it in part: ''Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes have vested and accrued and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed.'' It is to be noted that the ''rights'' which are dealt with are, first, rights which have ''vested and accrued,'' and, second, rights which are recognized as such ''by the local customs, laws and the decisions of courts.'' Conceding that the work done up to the time of the suspension of it under the withdrawal orders was sufficient to fulfill the requirements of our state law (Civ. Code, secs. 1415, 1416), it is undisputed that this work was not completed. The first legal question then is, What is the nature of the rights which the original locators had acquired up to and at the time of the

enforced suspension of work under the withdrawal orders? Our cases fully answer this question. As against all the world but the United States there was acquired a possessory right to continue with diligence the prosecution of the work until completion. "Such visible act (of possession accompanied by work) and avowed intent (to prosecute the work adequately and diligently) gave him a conditional right to the future use of the water prior to its actual use, the condition being that he should thereafter diligently continue the work to completion and then divert the water and apply it to a useful purpose, failing which his right would cease. Upon the performance of this condition the title to such use would become complete and perfect. In the meantime, however, he had an existing conditional right, manifested by actual visible possession of the works. It would be clearly a property right, and it being incidental and appurtenant to land, it was real property. (Civ. Code, sec. 658.)" (*Inyo Cons. Water Co.* v. *Jess,* 161 Cal. 516, [119 Pac. 934].) To precisely the same import is the later case of *Merritt* v. *City of Los Angeles,* 162 Cal. 47, [120 Pac. 1064]. In both of these cases this court was discussing the attempted interference with one who was or claimed to be in possession of the public domain under notices of appropriation, and who was or claimed to be in diligent prosecution of the work as against the hostile claim and interference of a *private third person.* That the law thus declared by these decisions is unimpeachable in point of soundness may not, we think, be successfully questioned. The property right is not dissimilar to that which this court declares belongs to the locator of oil lands, in peaceable and in diligent prosecution of work seeking a discovery of oil, before the discovery is actually made. Such a locator, we have held, has a possessory right which is property, and which he can maintain in the courts against trespassers or hostile private claimants. (*Miller* v. *Chrisman,* 140 Cal. 440, [98 Am. St. Rep. 63, 73 Pac. 1083, 74 Pac. 444]; S. C., *Chrisman* v. *Miller,* 197 U. S. 313, [49 L. Ed. 770, 25 Sup. Ct. Rep. 468]; *Weed* v. *Snook,* 144 Cal. 439, [77 Pac. 1023].) But none of these cases considered, for their exigencies did not call upon them to consider, the character of the rights thus obtained as against the paramount authority, the government of the United States. But we are not without positive pronouncement from the supreme court of the United States upon this precise question. In *Bear Lake Irr. Co.* v. *Garland,* 164

U. S. 1, [41 L. Ed. 327, 17 Sup. Ct. Rep. 7], the section from which we have quoted came before the court and received careful analysis. From the opinion of that case we quote at length, as follows:

"So far as the public land is concerned, over or through which these ditches for the canal were dug, the statutes above cited create no title, legal or equitable, in the individual or company that simply takes possession of such land. The government enacts that anyone may go upon its public lands for the purpose of procuring water, digging ditches for canals, etc., and when rights have become vested and accrued which are recognized and acknowledged by the local customs, laws, and decisions of courts, such rights are acknowledged and confirmed. Under this statute no right or title to the land, or to a right of way over or through it, or to the use of water from a well thereafter to be dug, vests, as against the government, in the party entering upon possession from the mere fact of such possession, unaccompanied by the performance of any labor thereon.

"Undoubtedly rights as against third persons are acquired by priority of possession, and the government will and does recognize such rights as between those parties. This is the principle running through the cases cited by the counsel for appellants. In *Sullivan* v. *Northern Spy Mining Co.*, 11 Utah, 438, [30 L. R. A. 186, 40 Pac. 709], which is one of those cases, the priority of possession of the person who entered upon the public land and dug the well was recognized as thereby making a superior title to the use of the water from the well over that acquired by a person who was the subsequent purchaser of the land from the government. In that case the well had been dug and the condition fulfilled. If no well had ever been dug, and a reasonable time for digging it had passed, the mere priority of possession would have given no superior title to the land over that acquired by the grantee from the government. It is the doing of the work, the completion of the well, or the digging of the ditch, within a reasonable time from the taking possession, that gives the right to use the water in the well or the right of way for the ditches of the canal upon or through the public land. Until the completion of this work, or, in other words, until the performance of the condition upon which the right to forever

maintain possession is based, the person taking possession has no title, legal or equitable, as against the government. What, if any, equitable claims a party might have upon the government who did a large amount of work, but finally failed to complete the necessary amount to secure the water or right of way, it is not necessary to determine or discuss. Those equities would not, in any event, amount to an *equitable title* to the right of way or to the use of the water, and so need not be here considered.''

In *United States* v. *Rickey Land & Cattle Co.,* 164 Fed. 496, Rickey had taken appropriate steps to secure a reservoir site on the public domain, had purchased works of considerable value for the purpose of diverting waters into the reservoir site and was actually engaged in the construction of a tunnel to lead the waters from the reservoir for useful distribution, when the lands affected by his work were temporarily withdrawn, as here, by the Secretary of the Interior for reservoir purposes. Rickey proceeded with the work under the contention that against the United States government he had acquired the vested right so to do. The government sought injunction under its bill, setting forth the facts, and the defendant, successor in interest to Rickey, demurred. The demurrer was overruled, the circuit court in so doing and in discussing the question saying: ''It is very clear that no one can under these sections acquire as against the government a vested easement in and to public lands for a reservoir site until the actual completion of the reservoir, so that the waters to be impounded therein could be applied to the beneficial uses contemplated by the irrigation system of which it forms a part. This was the construction placed upon these sections by the supreme court in *Bear Lake Irr. Co.* v. *Garland,* 164 U. S. 1, 18, 19, [41 L. Ed. 327, 17 Sup. Ct. Rep. 7].''

There can be no argument so sharp as to whittle down the obvious and controlling meaning of the language of these decisions which we have quoted. That language imports this, and nothing but this, that until the completion of the work no title, legal or equitable, vests in the appropriator, no right vests which the government of the United States is compelled to recognize. The property rights which do accrue are such as to protect the appropriator from the acts of all persons saving the paramount authority. So far as the United

States itself is concerned, it is under no justiciable duty in law or equity to such an appropriator until his work shall have been completed.

Before completion, what may the United States do? It may do as in the case of oil lands it has done, by withdrawals arrest all work before discovery, without compensation to the locator for his expenditures. (*United States* v. *Mid West Oil Co.,* 236 U. S. 459, [59 L. Ed. 673, 35 Sup. Ct. Rep. 309].) Congress, it is to be remembered, under the Constitution of the United States, has the sole power of disposition and control of the public lands. (U. S. Const., art. IV, sec. 3, subd. 2.) In contemplation of this power, the respondent's argument that the orders of withdrawal in this case were temporary orders, that they operated only to suspend and not to destroy the rights of the original locators, and that those rights were revived in all their fullness upon the formal vacation of the orders of withdrawal loses all force in view of the congressional exercise of the power to which we have adverted. Congress, had it chosen to do so, without any order of withdrawal having been made by the executive department, could have granted the lands and rights to the city of Los Angeles, as in fact it did, during the existence of the orders of withdrawal. It may be conceded that to have done so would have been a harsh exercise of the power, but this concession can have no effect upon the legality of its exercise. So here the legal situation presented is, and this statement of it is made in the light most favorable to respondent, that before respondent's predecessors in interest had acquired any vested right in the lands against the United States, Congress, in the exercise of its supreme authority, made conveyance to the city of Los Angeles of the lands and of the waters in connection therewith for all the purposes for which they were designed to be used by the original appropriators. It must be held that these appropriators and all others upon the public domain act with the knowledge and under the peril to their ventures that this may be done. The property rights which they acquire while working and before those rights have become vested as against the government of the United States are held, as it were, upon condition, in that they are liable to extinguishment at any time by an act of Congress directed to that end.

This conclusion, without regard to any other questions presented, is determinative of this case, and the judgment and order appealed from are therefore reversed.

Shaw, J., Sloss, J., Melvin, J., Lawlor, J., and Angellotti, C. J., concurred.