[Civ. No. 70. Fifth Dist. Aug. 1, 1962.]

COUNTY OF TUOLUMNE, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION et al., Defendants and Respondents; CITY AND COUNTY OF SAN FRANCISCO, Real Party in Interest and Appellant.

George A. Huberty for Plaintiff and Appellant.

Dion R. Holm and Thomas M. O'Connor, City Attorneys, McMorris M. Dow and Orville I. Wright, Deputy City Attorneys, John Elmer Barricklo and William F. Bourne for Real Party in Interest and Appellant.

Harold Raines, John B. Reilley and Frank E. Howard as Amici Curiae on behalf of Defendants and Respondents and of Real Party in Interest and Appellant.

Stanley Mosk, Attorney General, Dan Kaufmann, Assistant Attorney General, and Edward P. Hollingshead, Deputy Attorney General, for Defendants and Respondents.

*Assigned by Chairman of Judicial Council.

STONE, J.—The County of Tuolumne, pursuant to article XIII, section 1, of the California Constitution, assessed appropriative water rights located in that county but owned by the City and County of San Francisco. The assessment was reviewed, equalized and adjusted by the State Board of Equalization. Tuolumne County, dissatisfied with the decision, sought a writ of mandate in the superior court of that county, pursuant to section 1094.5, Code of Civil Procedure, praying that the original assessment be restored. Further, Tuolumne sought a court review of the proceedings had before the Board of Equalization. An alternative writ of mandate was issued and after the matter was heard, the court ordered the alternative writ discharged, the petition for writ of mandate denied, and Tuolumne to correct its assessment rolls in compliance with the decision of the Board of Equalization. Both County of Tuolumne and City and County of San Francisco have appealed from the judgment of the superior court.

San Francisco's filings for the right to appropriate water in Tuolumne County originally were located at various points along streams in the Tuolumne watershed. The water was actually diverted, however, at five locations within the county. At these points of diversion, San Francisco constructed facilities for the storage and release of water, and for the hydro-electric generation of power. For the assessment year 1960-1961 Tuolumne assessed the water rights exercised at each of the five points of diversion, and the following assessments were entered upon the tax rolls of Tuolumne County:

"A. The right to divert water to storage by means of O'Shaughnessy Dam located in the NW¼ of Section 16, T1N, R20E, MDB & M.

| Code Area | Assessed Value | |
|---|---|---|
| 54:00 | 2,492,000 | Vol. 2, p. 83 |

"B. The right to divert water to storage by means of Eleanor Dam located in the NW½ of Section 3, T1N, R19E, MDB & M.

| Code Area | Assessed Value | |
|---|---|---|
| ½ 54:00 | 420,350 | Vol. 2, p. 83 |
| ½ 54:03 | 420,350 | Vol. 2, p. 94-A |

"C. The right to divert water to storage by means of Cherry Dam located in the NE¼ of Section 5, T1N, R19E, MDB & M.

| Code Area | Assessed Value | |
|---|---|---|
| 54:04 | 607,000 | Vol. 2, p. 95 |
| 74:12 | 607,000 | Vol. 2, p. 75 |

"D. The right to divert water at the intake of Early Intake Powerhouse, known as Lower Cherry Aqueduct, the point of rediversion of waters stored in Eleanor and Cherry Dam and a point of direct diversion for waters accruing to Cherry Creek which includes Eleanor water located within the SW¼ of Section 31, T1N, R19E, MDB & M.

| Code Area | Assessed Value | |
|-----------|----------------|--|
| ½ 54:00 | 239,200 | Vol. 2, p. 83 |
| ½ 74:05 | 239,200 | Vol. 2, p. 20 |

"E. The right to divert water at the intake of Hetch Hetchy Aqueduct, the point of rediversion of waters stored in Hetch Hetchy Reservoirs and the point of direct diversion from the Tuolumne River located in the NE¼ of Section 11, T1N, R18E, MDB & M.

| Code Area | Assessed Value | |
|-----------|----------------|--|
| 54:00 | 1,037,000 | Vol. 2, p. 83." |

San Francisco made timely application to the Board of Equalization for a review of the appropriative water right assessments, as provided in article XIII, section 1, of the Constitution. At the board hearing, San Francisco and Tuolumne introduced evidence by way of testimony and exhibits concerning the location and value of the appropriative water rights. Following the hearing, the board issued its notice of decision, by which it reduced assessments A, B, D, and E to zero, and approved or left unchanged assessment C. Tuolumne then commenced proceedings in the superior court for a review of the board's decision. The superior court approved the decision of the board, and Tuolumne and San Francisco both appealed.

The first question to be determined is whether the appropriative water rights in Tuolumne County owned by San Francisco are taxable under the provisions of article XIII, section 1, of the Constitution. The pertinent part of this section provides:

"... that property ... such as may belong to ... any county, city and county, or municipal corporation within this State shall be exempt from taxation, except such lands and the improvements thereon located outside of the county, city and county or municipal corporation owning the same as were subject to taxation at the time of the acquisition of the same by said county, city and county, or municipal corporation; provided, that no improvements of any character whatever

constructed by any county, city and county or municipal corporation shall be subject to taxation. All lands or improvements thereon, belonging to any county, city and county or municipal corporation, not exempt from taxation, shall be assessed by the assessor of the county, city and county or municipal corporation in which said lands or improvements are located, and said assessment shall be subject to review, equalization and adjustment by the State Board of Equalization.''

Whether San Francisco's appropriative water rights are taxable rests upon the words ''as were subject to taxation at the time of the acquisition of the same by said county.'' Tuolumne places a construction on article XIII, section 1, which is novel, but since it misconstrues the import of the language just quoted, it is erroneous. It is argued that the purpose of the amendment is to permit taxation of any property acquired by one county in another county which would have fallen into private hands and become taxable had the outside county not acquired it. In its closing brief Tuolumne asserts: ''If the water rights had not been taken up by the City, or some other public corporation, they certainly would have been taken and used by private concerns or individuals and would have contributed immeasurably to the tax base of Tuolumne County.''

In considering this argument, it is difficult to call to mind any kind of property that wouldn't be ''taken up'' by private interests if not acquired by a county or some political subdivision. Under Tuolumne's construction of the amendment, all property acquired in one county by another county would be taxable. Such an interpretation leaves the words ''as were subject to taxation at the time of the acquisition of the same by said county,'' absolutely meaningless. Without the quoted language the amendment would subject all foreign-owned county property to taxation. Since the language is clear and unambiguous, Tuolumne's construction of the amendment must be rejected. ■ Only that property which was ''subject to taxation *at the time*'' it was acquired comes within the purview of article XIII, section 1. (Emphasis added.)

■ Turning now to the property assessed, we find that an appropriative water right is considered an interest in real property and taxable by the county in which the right is exercised, that is, the county in which the water is diverted. (*Waterford Irr. Dist.* v. *County of Stanislaus,* 102 Cal.App.2d 839 [228 P.2d 341]; *North Kern Water Storage Dist.* v.

*County of Kern,* 179 Cal.App.2d 268 [3 Cal.Rptr. 636].)
Even though water rights are considered real property for
tax purposes, the question before us is whether county-owned
water rights located within another county are taxable by
reason of article XIII, section 1, of the Constitution. Under
direction of this amendment the determination must rest upon
the nature of the property right at the time it was acquired,
that is, whether the right acquired was taxable in the hands
of the predecessor of the county.

Analyzing San Francisco's water rights sought to be taxed
by Tuolumne in the light of article XIII, section 1, we learn
from the record that none had ripened into appropriative
water rights when acquired. They were then mere filings for
the right to appropriate water. Further, the filings acquired
were of three kinds: first, filings made directly by San Fran-
cisco acting in its corporate capacity; second, filings made
by Mayor Phelan of San Francisco and City Engineer Man-
son; third, filing rights purchased from one Hall and from
Sierra Water Co.

The filings made by San Francisco as a political entity were
acquired directly from the State government and without
question they are exempt from taxation. Tuolumne contends
that the Phelan and Manson filings were private property
and subject to taxation at the time of acquisition. How-
ever, Phelan and Manson filed, not for themselves, but on
behalf of San Francisco; they never asserted ownership in
themselves. We have judicial precedent for this assertion
in a Supreme Court decision, *Meridian, Ltd.* v. *City &
County of San Francisco,* 13 Cal.2d 424 [90 P.2d 537, 91
P.2d 105], which delineates the history and the nature of the
water rights of San Francisco in Tuolumne County. These
are the same water rights we are considering, and at page 432
the court had this to say:

"In 1901 the City and County of San Francisco started a
project for the storage and diversion of the waters of the
Tuolumne River for the use of the city and other localities
adjacent to San Francisco Bay. It has become known as the
Hetch Hetchy project and includes reservoirs, power plants
and diversion works in the watershed of the Tuolumne River
above the Don Pedro reservoir. The first appropriations made
*in behalf of the city for its project were made by Mayor
James D. Phelan on July 29, 1901,* for 5,000 inches of the
flow of Eleanor Creek below the outlet of Lake Eleanor, and

10,000 inches of the flow of the Tuolumne at the outlet of Hetch Hetchy Valley. . . . Eighteen notices of appropriation under the state law in force prior to the effective date of the Water Commission Act (December 19, 1914) were posted during the period July 29, 1901, to February 27, 1911, inclusive. *These appropriations were posted in the name of the city or one of its representatives,* or by William Ham Hall or by Sierra Ditch Water Company. The appropriations made by the last two parties were purchased by the city." (Emphasis added.)

Tuolumne depreciates as dicta the foregoing language from *Meridian,* suggesting that the Supreme Court did not have before it the precise question which confronts us. Nonetheless, we find the court's reasoning persuasive, and we are content to adopt it as controlling on this issue since it presents a realistic appraisal of the circumstances surrounding the filings by Phelan and Manson. The Board of Equalization and the trial court were correct in holding the water rights derived from the filings made by Phelan, the mayor of the city, and by Manson, the city engineer, to be tax-exempt property within the meaning and intent of article XIII, section 1, of the Constitution.

The third class of appropriative water rights of San Francisco emanate from filings purchased from Hall and Sierra Water Co. The fundamental question is not whether these appropriative filings were, in fact, taxed when acquired by San Francisco from private individuals, but rather, whether they were "subject to taxation." Since these filings were privately owned when purchased by San Francisco they would, at first impression, seem to come within the quoted language. The answer is not so simple as it first appears. San Francisco argues that the water-right filings were conditional, unperfected rights and therefore not subject to taxation. The contention is that a filing for a right to appropriate water is simply a right to "prove up" a water right by constructing a diversion works. San Francisco points out further that a filing has been described by the Supreme Court as an inchoate right. (*Madera Irr. Dist.* v. *All Persons,* 47 Cal.2d 681, 691 [306 P.2d 886]; Hutchins, The California Law of Water Rights, p. 160.) But this designation simply relates to the incomplete or unperfected status of the right; it does not purport to define the interest in or the scope of the property right the appropriator acquires by filing. ▮▮▮ Despite the use of the term "inchoate," California courts have uniformly held that one who files has a possessory interest in real

property pending perfection of his right to appropriate water. (*Yuba River Power Co.* v. *Nevada Irr. Dist.*, 207 Cal. 521, 527 [279 P. 128].) In the case of *Inyo Consol. Water Co.* v. *Jess,* 161 Cal. 516 [119 P. 934], it was said, at page 520:

"There is no case, arising prior to the enactment of the code, which holds that the party who thus in good faith began and diligently prosecuted the work on a dam and ditch for the diversion and use of water, could not protect his incipient right to the water, against the hostile diversions and claims of others, by an appropriate suit for that purpose. It is obvious that this could not be so. Such visible act and avowed intent gave him a conditional right to the future use of the water, prior to its actual use, the condition being that he should thereafter diligently continue the work to completion and then divert the water and apply it to a useful purpose, failing which his right would cease. Upon the performance of these conditions, his title to such use would become complete and perfect. In the mean time, however, he had an existing conditional right, manifested by actual visible possession of the works. It would be clearly a property right, and it being incidental and appurtenant to land, it was real property." (See also *Merritt* v. *City of Los Angeles,* 162 Cal. 47, 50 [120 P. 1064] ; Hutchins, The California Law of Water Rights, p. 161.)

The conclusion that the filer owns a property right even though he has not completed his diversion facilities or perfected his right to actually appropriate water, was also reached by the Supreme Court in *Silver Lake etc. Co.* v. *City of Los Angeles,* 176 Cal. 96 [167 P. 697]. Especially germane is the following language discussing the nature of a filing to appropriate water, appearing at page 101 of *Silver Lake:* "The property right is not dissimilar to that which this court declares belongs to the locator of oil lands, in peaceable and in diligent prosecution of work *seeking a discovery of oil, before the discovery is actually made.* Such a locator, we have held, has a possessory right which is property, and which he can maintain in the courts against trespassers or hostile private claimants." (Emphasis added.)

The case of *Weed* v. *Snook,* 144 Cal. 439 [77 P. 1023], cited in *Silver Lake,* held also that the right arising from a mining location of oil lands during discovery work but before discovery, is a property right. In the same volume in which *Weed* v. *Snook* is reported, we find the case of *Bakersfield & Fresno Oil Co.* v. *County of Kern,* 144 Cal. 148 [77 P. 892],

holding the possessory interest of a locator upon oil lands in the public domain to be taxable by the County of Kern. Thus the decisions of the Supreme Court, by comparing an appropriative water filing to a filing to prospect for oil and, in turn, holding the filing for oil to be taxable, lead us to the conclusion that the filing rights to appropriate water purchased from Hall and Sierra Water Co. were property rights subject to taxation when purchased by San Francisco.

The early case of *People* v. *Shearer*, 30 Cal. 645, discusses the question of whether property interests of private citizens in the public domain are taxable. The rule enunciated in *Shearer* (1866) holding that privately owned possessory interests in tax exempt property are taxable, is still followed in California. (*De Luz Homes, Inc.* v. *County of San Diego*, 45 Cal.2d 546, 562 [290 P.2d 544]; *Forster Shipbldg. Co.* v. *County of Los Angeles*, 54 Cal.2d 450, 455 [6 Cal.Rptr. 24, 353 P.2d 736].) The court's reasoning in *Shearer* is persuasive, and we quote from pages 658-660:

"Had it not been for the stipulation to the contrary in the Act of admission, the United States might have been required to pay taxes on the land owned by it, situate within the limits of California, like any other proprietor of lands; and it appears to us manifest that it was to guard against any such possible claim on the part of the State of California that the provision was inserted in the Act of admission. The General Government sought to protect its own property, its own interests, and not that of the citizens of California. Congress could never have intended by the introduction of the provision under consideration to interfere with the sovereign power of the State of California over its citizens, or over the property of its citizens. This provision can have full effect by confining its operation to an exemption of the property interest of the General Government itself, and it cannot be construed to limit the exercise of a sovereign power of the State over a citizen, or any property of a citizen, unless the intention to so limit it is clearly expressed. Such limitations upon the sovereign powers of a State must be strictly construed. They are not to be extended by doubtful implications beyond the manifest import of the language.

". . . The pre-emption right is not the possession, although it may be, and when it exists at all, is based upon a possession. These possessions, as before stated, are recognized and protected as property by the Legislature in many instances, and

by the Courts and the people always. And this property is property in the citizen or inhabitant having possession, and not in the United States. This property, so recognized and protected, in our judgment is clearly not exempt from taxation under the clause in the Act of Congress September 9th, 1850, exempting the public domain of the United States from taxation. The public domain of the United States and this species of property of the citizen in the possession of the public lands are in no respect identical. It is only the property interest of the citizen that can be taxed or affected by a tax sale. The title of the Government, the land itself, cannot be affected, nor will any title that may hereafter be derived from the Government be affected.''

The distinction between a preemption filing discussed in *Shearer* and an appropriative water filing lies in the extent of possession. This distinction is simply one of degree which bears upon the value of the property right, rather than upon whether it is taxable.

 The history of water development in California reveals that appropriative water right filings have long been recognized as valuable property rights. (*Inyo Consol. Water Co.* v. *Jess, supra,* 161 Cal. 516, 520; *Merritt* v. *City of Los Angeles, supra,* 162 Cal. 47, 50.) Civil Code section 1414 provides, ''[a]s between appropriators, the one first in time is the first in right.'' (Enacted 1872.) Although the appropriator cannot take water until his diversion facilities are constructed, the priority of his right to take relates back to the date of filing. (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 28 [198 P. 784]; *State of Arizona* v. *State of California,* 298 U.S. 558 [56 S.Ct. 848, 80 L.Ed. 1331].) Hence under California water law the importance and value of the filing lie in the priority it carries. Any question whether the filings before us were valuable property rights at the time of purchase is dispelled by the record, which reflects that San Francisco paid Hall and Sierra Water Co. $778,967 for them in 1910. This manifest value stemmed from the priority each filing carried and from the fact that a filing is an integral step in securing the right to take water. It is the essential element of appropriation.

 Thus the law recognizes a filing as a property right which is protected by the courts, a right which must be conveyed with the same dignity as any other interest in land.

Furthermore, the conveyance vests in the grantee a priority right to appropriate water.

San Francisco makes the additional argument that since the Hall and Sierra filings were only possessory interests in real property, they became exempt from taxation upon acquisition by San Francisco. This argument is predicated upon *Rothman* v. *County of Los Angeles,* 193 Cal.App.2d 522 [14 Cal.Rptr. 427], in which it was held that a lease of real property for a term of years by the County of Los Angeles was a possessory interest in real property, but not land within the meaning of article XIII, section 1, of the Constitution. The *Rothman* case followed a similar holding in *Ohrbach's, Inc.* v. *County of Los Angeles,* 190 Cal.App.2d 575 [12 Cal.Rptr. 132], both cases holding the County's possessory interest as lessee exempt from taxation.

The possessory interests acquired by Los Angeles, as disclosed by the facts of both the *Rothman* and *Ohrbach's* cases, are clearly distinguishable from the possessory interests acquired by San Francisco from Hall and Sierra. Los Angeles, as lessee, acquired a temporary right to use real property. On the other hand, San Francisco was conveyed title by deed to appropriative water right filings. ▮▮▮ The water rights which emanated from these filings are land in the sense that the word ''land'' is used in article XIII, section 1. (*Waterford Irr. Dist.* v. *County of Stanislaus, supra,* 102 Cal. App.2d 839, 841; *Alpaugh Irr. Dist.* v. *County of Kern,* 113 Cal.App.2d 286, 293 [248 P.2d 117]; *North Kern Water Storage Dist.* v. *County of Kern, supra,* 179 Cal.App.2d 268, 279.) ▮▮▮ An interlocutory interest in a water right, that is the filing from which a water right emanates, is likewise an interest in land within the rationale of article XIII, section 1.

Reflection upon the scope of article XIII, section 1, also impels us to reject San Francisco's contention. ▮▮▮ The purpose of the amendment as presented to the people was to prevent the removal of water rights from the tax rolls of the counties in which the water rights originate. In *City and County of San Francisco* v. *County of Alameda,* 5 Cal.2d 243 [54 P.2d 462], the Supreme Court stated, at pages 245-246:

''The undoubted purpose of the amendment was primarily to safeguard the tax revenues of smaller counties wherein large municipal corporations had purchased, or would acquire,

extensive holdings and which would, except for the amendment, be exempt from local taxation. With the exemption in force, the serious financial embarrassment of the counties in which the holdings were situated was a reality. The argument sent to the electors of the state when the amendment was proposed also discloses that, unless the amendment be adopted, impending *disaster would result to smaller counties by the removal from the local tax rolls of lands and water rights* acquired and to be utilized in connection with the acquisition or extension of municipal water supplies such as were then in progress by the City and County of San Francisco and the City of Los Angeles. The adoption of the amendment was evidence that the acquisition of such lands and *water rights* should be without prejudice to the outlying counties whose existence from an economic and governmental standpoint depended upon the tax revenues derived therefrom. It was therefore provided that such lands and improvements thereon as were taxable at the time of the acquisition of the same by municipalities should continue to be taxable and should not be exempt from local taxation.'' (Emphasis added.) (See also *Rock Creek Water Dist.* v. *County of Calaveras,* 29 Cal.2d 7, 9 [172 P.2d 863].)

San Francisco misapprehends the scope and the object of article XIII, section 1, as presented to the electors and as approved by them. The language ''as were subject to taxation at the time of acquisition of the same by said county'' refers to the taxable status of the property in the hands of the transferors (Hall and Sierra) and not the transferee (San Francisco). As pointed out by the Supreme Court, the purpose of the amendment was to prevent the removal of private property from the tax rolls upon purchase by an outside county. Thus it is the taxability of the property as it stood at the time of acquisition, and immediately before transfer, that is determinative.

To summarize, the filings obtained from Hall and Sierra were taxable when acquired; as water rights they are presently land within the meaning of article XIII, section 1, of the Constitution, and taxable. That there was an interval during which San Francisco owned the filings as possessory interests in real property of an inchoate nature does not now place them beyond the purview of article XIII, section 1.

We now turn to the question of the assessment of the appro-

priative water rights derived from the Hall and Sierra filings. Each county assessor is required by Revenue and Taxation Code, section 401, to assess all taxable property within the county at its full cash value. This includes appropriative water rights. (*North Kern Water Storage Dist.* v. *County of Kern, supra,* p. 278.) Full cash value of property has been interpreted to mean its full market value. (*De Luz Homes, Inc.* v. *County of San Diego, supra.*) Yet neither by Constitution nor by statute is the assessor directed to follow any particular method in determining full cash value. This is necessarily so because the process of valuing property does not always lend itself to rigid rules and formulas. Writers on the subject, such as Fish (Value of Real Property in California, p. 137) and Bonbright (Valuation of Property, vol. 1, p. 451), tell us that no one method of determining the value of property is completely accurate or infallible, and that most experts utilize more than one method, or a combination of methods. The three methods generally used are (a) sale price between a willing seller and a willing and able buyer, (b) original cost and its correlated replacement cost, and (c) capitalization of income.

The valuation problem facing us is more complex than any illustrations used by the textwriters, or any actual case we have found in the reports. ▇▇▇ To begin with, the right to appropriate water, although a property right, is purely usufructuary. (Hutchins, Water Rights in California, p. 37; 51 Cal.Jur.2d, Waters, § 50, p. 512; *Eddy* v. *Simpson,* 3 Cal. 249, 252 [58 Am.Dec. 408].) The appropriator has no property right in the stream of water in its natural channel. In other words, the property right cannot be utilized without diversion facilities because until water is diverted there is no usufruct. ▇▇▇ Thus the utility of appropriated water depends upon not one but two property interests: diversion structures and the right to appropriate water. Although separate property rights they are integrated and, for practical purposes, inseparable. In this case these reciprocal property rights give rise to a valuation anomaly because the diversion facilities are not taxable. Placing a value on the usufructuary right to divert water separate and apart from the structures which are necessary to divert it, presents a knotty problem which does not admit to an entirely satisfactory solution.

The specialized nature and the cost of San Francisco's five diversion facilities consisting of dams, powerhouses, penstocks,

afterbays, conduits and canals, rule out a seller-buyer relationship in the accepted sense. Any attempt to fix a value on the basis of a sale would be completely hypothetical and, of necessity, predicated upon either replacement cost or capitalization of income. The original cost method would be misleading because only filing rights were purchased; which rights have since ripened into full appropriative water rights. Since they must be valued as presently used water rights, original cost gives no indication of present value. Nor does original cost or replacement cost of the ' diversion improvements help much in determining the full cash value of the water rights from which they must be distinguished. Neither San Francisco nor Tuolumne places any emphasis on replacement cost, and the record in regard to that method of valuation is more confusing than helpful. Fundamentally, both San Francisco and Tuolumne depend upon values derived from variations of the capitalization of income method.

San Francisco asserts that the Board of Equalization and the trial court erred in approving Tuolumne's method of capitalizing income, principally because Tuolumne capitalized only the diversion facilities within the county, that is, improvements down to the last or lowest point of diversion on the stream. San Francisco contends that its entire distribution system should have been capitalized, pointing out that the Board of Equalization is required to use the "unit system" when valuing public utilities. Under that system an entire public utility system is assessed as an operating unit and value is then allocated to the individual properties for assessment purposes. San Francisco argues that Tuolumne is bound by the unit rule and must capitalize the transportation system which crosses the San Joaquin Valley, and the distribution system on both sides of San Francisco Bay, as well as the property in Tuolumne County. The board, since it must value intercounty properties owned by public utilities, is required to use the unit system; but nothing has been called to our attention which indicates that the unit system must be followed by a county assessing property within its own boundaries. Tuolumne's failure to use the unit rule, standing alone, is not ground for reversal.

The assessor fixed the value of the water rights by the capitalization method, treating them as an integral part of the entire system located within the county. All structures, including dams, conduits, powerhouses, penstocks and after-

bays, down to the lowest diversion point on the stream, were capitalized. Although San Francisco has vigorously attacked this method, the record upon which the board's decision rests does not indicate that the assessment was grossly inaccurate, arbitrary or unfair. The following language from *Alpaugh Irr. Dist.* v. *County of Kern, supra,* 113 Cal.App.2d 286, at page 294, is applicable:

"We think no proof was made by appellant that this method of arriving at the value of the water rights would not give a reasonable result. It is obvious that in assessing a water right it might be necessary to adopt a method different from that commonly used in assessing land and it cannot be said as a matter of law that there was anything invalid in the method employed by the assessor."

Nor did the board err by not using the unit rule in reviewing the Tuolumne assessments. The function of the Board of Equalization here was not to make an original valuation of the water rights, but to review Tuolumne's valuation of them. The board was not free to disregard Tuolumne's assessment; rather its duty was to review, equalize and adjust the assessment. Therefore the unit rule which the board must follow in valuing public utility properties in the first instance does not apply when it is acting as a board of review pursuant to article XIII, section 1, of the Constitution.

San Francisco's next objection is that Tuolumne did not use the actual sale price charged by San Francisco for water and power, as the basis for capitalizing income. Tuolumne used a price for water taken from Bureau of Reclamation contracts for the sale of water. For income from the sale of electricity it used the price agreed to be paid by Pacific Gas and Electric Company in one of its contracts to purchase power. Tuolumne's method appears reasonable, considering that San Francisco operates its municipal water and power system for the benefit of its citizens, not as a profit-making business. An expert witness for San Francisco used the non-profit sale price in capitalizing income, and arrived at a value of zero for all of San Francisco's water rights in Tuolumne County. It would seem incongruous, to say the least, for the board, or for this court, to hold valueless the water rights which are the foundation upon which a multimillion dollar project rests, water rights without which the project would not have been constructed and without which it cannot now operate. We find no error in the board's approval of Tuol-

umne's use of known market prices for water and power to capitalize income, rather than the price San Francisco actually charges.

The next assessment problem arises from the fact that San Francisco does not use all of its water rights. As previously pointed out, from the tax standpoint San Francisco's water rights fall into three categories. Thus which water rights are used at each point of diversion determines their taxability. San Francisco contends its appropriative water rights should be considered as pooled or, to use its terminology, considered as a cluster of rights all partially used. Tuolumne contends the appropriative water rights at each point of diversion should be considered separately and in sequence according to geographical proximity to the point of diversion. Simply stated, Tuolumne's theory is that the filing nearest the point of diversion should be considered as being first in use; if that water right is insufficient to provide all of the water used at that point of diversion, the next water right in geographical proximity should then be considered, and so on until the total appropriative water rights used have been determined.

The board followed neither San Francisco nor Tuolumne. It considered the appropriative water rights at each point of diversion in order of priority, up to the amount of water used by San Francisco. The board's recognition of water use at each point of diversion according to priority of filing, follows a well established tenet of California water law. Certainly, if adverse claims were made to San Francisco's appropriative water rights, title would be determined on the basis of priority. (Civ. Code, § 1414; *City of San Bernardino* v. *City of Riverside, supra,* 186 Cal. 7, 28; *State of Arizona* v. *State of California, supra,* 298 U.S. 558; *Joerger* v. *Pacific Gas & Elec. Co.,* 207 Cal. 8, 26 [276 P. 1017].) The board correctly determined that the usé of water rights and consequently the assessment at each point of diversion, is determined by order of priority.

Tuolumne argues that the change in the basic method of assessing water rights of San Francisco from geographic proximity to the point of diversion used by Tuolumne, to the priority of water rights at the point of diversion adopted by the board, gives a different result for assessment D. Tuolumne points out that San Francisco has the right to divert and that at times it does divert 190 cubic feet per second at Lower

Cherry Aqueduct. This point of diversion appears on assessment roll ''parcel D,'' which assessment was reduced to zero by the board. Tuolumne contends that 90 of the 190 cubic feet derive from filings purchased by Hall and are taxable.

The record is clear that the first filing in priority at this point of diversion was made by Mayor Phelan for 100 cubic feet per second. Since we have heretofore concluded that the filings acquired for San Francisco by the filings of Mayor Phelan are tax-exempt, the first 100 cubic feet per second were correctly assessed at zero. Although there was some testimony that at times the flow released at Lower Cherry reaches 190 cubic feet per second, the testimony does not make clear the source of the additional 90 cubic feet. There is evidence from which it could be inferred that this water derives from the second filing in priority, which was acquired by San Francisco from Hall. There is also evidence, as the board points out, that the additional 90 cubic feet per second consists of water released from an upper dam, which water rights are included in assessment C. Since assessment C was sustained by the board, double taxation would result if the same water were to be taxed again under assessment D.

Furthermore, it appears that much of the flow in excess of 100 cubic feet per second consists of water belonging to irrigation districts located on the lower river and stored on their behalf. Also, some of the water is excess flood water. Since there is substantial evidence to support the findings and the holding of the board as to assessment D, we must reject Tuolumne's contention that 90/190ths of the assessment should stand.

San Francisco also objects to the description of its assessed property. Tuolumne described the water rights by reference to the points of diversion. San Francisco complains that since its water rights are scattered along the streams, the description does not inform it which of its many appropriative rights are being assessed. The argument overlooks the fact that the water rights are used at the points of diversion, not at the points of filing. A number of California cases hold that for tax purposes the situs of water rights is the place of diversion. These cases are collected and succinctly discussed in *North Kern Water Storage Dist.* v. *County of Kern*, 179 Cal.App.2d 268, at page 272 [3 Cal.Rptr. 636]. San Francisco built dams and created holding reservoirs to impound water for storage and to operate elec-

trical generating plants. This, in turn, required use of the water rights at the diversion points. It should be noted parenthetically that San Francisco had the right to move the point of diversion of each of its several appropriative water rights from the point of filing to the damsite where used. (*Perry* v. *Calkins*, 159 Cal. 175, 179 [113 P. 136] ; *Willits Water & Power Co.* v. *Landrum*, 38 Cal.App. 164, 174 [175 P. 697] ; 51 Cal.Jur.2d, Waters, § 326, p. 786.) The point of filing is no longer of significance for tax purposes, and since San Francisco established the points of diversion, it should not have been misled by a description of its water rights with reference to each place of diversion.

Furthermore, Tuolumne's original assessment was made on the presupposition that all of San Francisco's water rights were taxable, and it described all of them with relation to the points of diversion. On the other hand, San Francisco contended that none of its water rights were taxable. Therefore the original assessment and San Francisco's objections thereto should not have misled either county. During the board hearing, maps, drawings and other exhibits were received in evidence, which clearly disclosed the points of diversion of all the appropriative water rights owned by San Francisco. These exhibits were fully explained by testimony. As a result of the hearing, the board eliminated all of the water rights assessed by Tuolumne except those used at the point of diversion described by Assessment ''C.'' Certainly, in view of the record before us, it cannot be successfully urged that the description of the water rights which the board found taxable under Assessment ''C'' is misleading to San Francisco. The circumstances here presented come within the rationale of *City & County of San Francisco* v. *County of San Mateo*, 17 Cal.2d 814 [112 P.2d 595], where the court said, at page 819:

''Plaintiff cannot complain that the description of the flume on the assessment rolls is insufficient inasmuch as it has not been misled. It unquestionably knew what property was assessed to it.'' (See *Alpaugh Irr. Dist.* v. *County of Kern*, *supra*.)

San Francisco also contends the assessment is void because the value used by the county assessor was determined by an engineer. This, it is asserted, makes the assessment that of the engineer and not the assessor. We fail to see anything wrong with this procedure, as a tax assessor could hardly be

expected to have more than a superficial knowledge of the value of property so complex as the diversion and hydroelectric power structures here involved. The assessor did the intelligent thing by hiring an engineer who had assessed other works of a similar nature and who was prepared by his education, background and experience to survey the various projects. The engineer gathered data, analyzed and evaluated it, and then determined the value of water rights as an integral part of the tax-exempt diversion improvements. Assessors in metropolitan counties engage the services of experts to assess specialized properties, and we cannot see the distinction San Francisco makes that the specialists in metropolitan counties are regular employees on the payroll of the county assessor, while in this case the Tuolumne assessor hired an "outside" engineer to do the job. San Francisco's argument that the tax assessor was not authorized by law to engage the services of an engineer or that the County of Tuolumne was not authorized to pay an engineer for such services, is immaterial. That question is one between Tuolumne County and the engineer. When the assessor adopted and placed on the assessment rolls the value which resulted from the engineer's work, it became the official act of the assessor and likewise an official record of Tuolumne County.

Even more fundamental is the fact that we are reviewing the action taken by the Board of Equalization pursuant to article XIII, section 1, of the Constitution of California. At this point the manner in which the county assessor arrived at the assessed value of the property has been superseded by the review and equalization decision of the board, which was made after considering evidence on behalf of both San Francisco and Tuolumne. ▮▮▮ The procedure involved and the position of a reviewing court is succinctly stated in *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564, as follows:

"The assessing authority's estimate of the value of specific property at a specific time is reviewed by the board of equalization at the request of the taxpayer [citation], and the board's decision in regard to specific valuations and the methods of valuation employed are equivalent to the findings and judgment of a trial court and reviewable only for arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature."

For reasons hereinbefore elaborated, we believe the record

reflects substantial evidence in support of the decision of the Board of Equalization.

Finally, San Francisco contends that Tuolumne had no authority under the provisions of section 1094.5, Code of Civil Procedure, to seek judicial review of the action of the Board of Equalization. Tuolumne relies upon the case of *People* v. *County of Tulare,* 45 Cal.2d 317 [289 P.2d 11]. In that case the Tulare County assessor had assessed the taxable property of the County. The Board of Equalization, after a hearing, directed him to increase the assessed valuation of all taxable property on the tax rolls in accordance with the findings of the board. The County of Tulare filed an action in the superior court seeking a review of the board's order, pursuant to the provisions of section 1094.5, Code of Civil Procedure. The People, through the Attorney General, then petitioned the Supreme Court for a writ of mandate directing the County of Tulare to obey the order of the Board of Equalization. It was the position of the People that the superior court had no authority to review the acts of the Board of Equalization for the reason that it is a constitutional body, statewide in scope, exercising both administrative and quasi-judicial functions. The Supreme Court denied the petition of the People and, in effect, established the right of a county to seek a review of proceedings before the Board of Equalization by instituting appropriate proceedings in the superior court.

In the *Tulare County* case the Supreme Court held as follows, at pages 319-320:

"The Legislature, in section 1094.5 of the Code of Civil Procedure, has provided an appropriate method of reviewing acts of a statewide administrative and quasi-judicial agency such as the State Board of Equalization. [Citation.] The action of the State Board of Equalization is reviewable in the superior court pursuant to the provisions of section 1094.5 of the Code of Civil Procedure."

San Francisco attempts to distinguish the *Tulare County* case by pointing out that a county assessor has no right to seek a court review of an equalization of his assessments by the board of supervisors. This, contends San Francsico, by analogy prohibits the tax assessor of Tuolumne County from appealing to a court for a review of an equalization of his assessment by the Board of Equalization. In its closing brief San Francisco states that "San Francisco sees no difference between allowing the assessor, a county officer charged with

the duty of assessing all taxable common property, to mandate the local board of equalization upon the latter's reduction of one of his assessments, and allowing a local board of supervisors, having no direct duty or responsibility in its county, to mandate an agency of the State dealing with matters within its jurisdiction. Both situations concern intra-governmental disputes, and the beneficial interest in each is the same.''

The questioned assessments in this case do not present an intragovernmental dispute. Initially it was an intercounty dispute between the City and County of San Francisco and the County of Tuolumne. But more important, the taxing procedure with which we are concerned is singular in that Tuolumne's power to tax in the first instance was specially conferred by article XIII, section 1, of the Constitution of the State of California. This constitutional amendment, which gives the county the right to tax, provides that the assessment shall be subject to review, equalization and adjustment by the State Board of Equalization. Thus there is no analogy to the ordinary county tax procedure. We think this case comes within the rationale of *People* v. *County of Tulare, supra.*

Furthermore, justification of court review of quasi-judicial functions of the board is evidenced by this case. For instance, two principal questions decided by the Board of Equalization related not to valuation but to points of law. The board was required to determine the nature of a filing for an appropriative water right, a purely legal question. Whether Mayor Phelan and Engineer Manson each filed for appropriative water rights on his own behalf or on behalf of the City and County of San Francisco, likewise presented a legal question. Since members of the Board of Equalization are laymen and are elected to office, they may or they may not have had legal training or experience. It strikes us as scarcely debatable that the legal questions presented here and questions of law which are certain to confront the board in the future, should be reviewed by the courts.

The judgment is affirmed.

Conley, P. J., and Brown, J., concurred.