[Civ. No. 7353. Fourth Dist. April 8, 1964.]

HARRY R. ERWIN et al., Plaintiffs and Appellants, v. THE GAGE CANAL COMPANY, Defendant and Respondent.

Walker, Sullivan, Hews, Brown & Yakutis and Alexander B. Yakutis for Plaintiffs and Appellants.

Redwine & Sherrill, Earl Redwine and Justin M. McCarthy for Defendant and Respondent.

STONE, J.†—This action by four shareholders of defendant corporation is the outgrowth of a prior action by the City of Riverside in eminent domain to condemn the assets of the defendant herein, a mutual water company. Defendant appeared in that action and by its answer alleged ownership of the water rights, diversion works, canals, pumping plants and other property used to deliver water to the company's shareholders. Thereafter the directors of defendant and a shareholders' committee worked out a proposed agreement to be used as the basis for a judgment in condemnation and thus obviate a trial. It appears that the proposed settlement agreement was approved by the number of shareholders required by the articles of incorporation and the bylaws of defendant.

Riverside's complaint in condemnation and the proposed agreement both recognize and guarantee the integrity of each shareholder's entitlement to water according to the terms appearing on each share certificate.

Plaintiffs, shareholders of defendant water company, dissatisfied with the proposed solution of the condemnation proceeding, filed two actions against defendant. By the first action plaintiffs sought to quiet title to the water rights in the shareholders, to secure an injunction restraining defendant from proceeding with the agreement and the settlement of the condemnation action, and for declaratory relief. By the second complaint plaintiffs sought to enjoin defendant's execution of the proposed agreement or to settle the condemnation action by a judgment pursuant to the agreement, upon

†Assigned by Chairman of Judicial Council.

the ground such acts are ultra vires. Despite the various kinds of relief sought by plaintiffs in the two actions, the matrix of each and every claim lies in plaintiffs' contention that the shareholders of the corporation hold title to the water rights and to all property utilized by defendant mutual water company to divert and deliver water. In short, plaintiffs argue that defendant holds title to all of its property, including water rights, as trustee or agent for the shareholders.

The trial court entered judgment for defendant in each action, and the shareholders are here on appeal.

Plaintiffs base their contention that title to The Gage Canal Company water rights is vested in the shareholders, upon cases holding that a water right which is appurtenant to specific land is real property, and that it possesses the characteristics of an easement. Therefore, argue plaintiffs, the canals, ditches, pumps and flowage rights used to transport water pursuant to the water rights, constitute the servient tenement.

The argument begs the question because it presupposes that it is the water right itself, the basic property right from which emanate all other property rights or interests here in issue, that is appurtenant to the land of each shareholder. The primordial question is whether it is the water right or simply the right to receive water, that is appurtenant to the land. The answer depends upon whether at the time defendant acquired the water rights it became the owner thereof, or whether ownership remained in the landowners-grantors, so that defendant now holds the water rights as a mere trustee or agent.

Likewise, the argument of some of the plaintiffs that they own the actual water rights since they can trace their titles to predecessors in interest who conveyed water rights to defendant, is a non sequitur, because this argument, too, ignores the pivotal question of whether each predecessor conveyed title to the water rights to defendant or whether each simply designated the water company his trustee or agent to hold the water rights in trust for him.

One of the earliest cases making the distinction is *Hildreth* v. *Montecito Creek Water Co.*, 139 Cal. 22 [72 P. 395], a case decided in 1903. ■ The following language pertinent to the question here, appears at page 29: "If the persons owning such rights see fit to form a corporation and delegate to such corporation the work of making the diversion and distribution, and of constructing and keeping in repair the

dams and conduits, reserving to themselves their rights in the water, as was done in this case, they do not thereby dedicate or appropriate to public use the water thus reserved and used by them. The corporation becomes merely their agent for the purpose of serving their several interests, so far as they may be served by a common system of works, the water remaining the subject of individual ownership and private use as before.''

A later case, *City of Glendale* v. *Crescenta Mut. Water Co.*, 135 Cal.App.2d 784, decided in 1955, puts the distinction in a nutshell, at page 801 [288 P.2d 105]: ''Respondent's counsel assert that the water belongs to the shareholders, that they pay nothing for it when delivered, that the only charge paid is for production and distribution, and hence there is no purchase or sale. Reliance is placed upon *Stratton* v. *Railroad Com.*, 186 Cal. 119 [198 P. 1051]; *Frazee* v. *Railroad Com.*, 185 Cal. 690 [201 P. 921]; *Hildreth* v. *Montecito Creek Co.*, 139 Cal. 22 [72 P. 395]. Those decisions hold that in the case of shareholders who own and pool water rights their mutual water company becomes merely their agent in producing and delivering to them their own water. But that is not true of water which is owned by the mutual company and delivered by it to its shareholders even though their stock is appurtenant to their respective lands. (See *Consolidated People's Ditch Co.* v. *Foothill Ditch Co.*, 205 Cal. 54, 63-64 [269 P. 915].)''

■ Obviously the issue is one of fact to be determined from the circumstances surrounding the conveyances to The Gage Canal Company of water rights and other property that it now holds, and the manner in which it has exercised control thereof. The history of the company, particularly its acquisition of water rights, its acquisition of other property, its development of water and water rights, and its relations with its shareholders over the years, must be considered in determining the issue.

■ Since the history of defendant covers more than 60 years, we have not burdened this opinion by setting it forth in full. We have, however, appended to this opinion plaintiffs' condensation of the history related in their opening brief, so that these facts are available to anyone interested. We merely note here that the history of The Gage Canal Company reflects no reservation of title by the owners who conveyed the various water rights to Gage, nor does it reflect a pooling of water rights by property owners as a more con-

venient and economical means of getting water to the land to which the water rights are appurtenant.

The Gage Canal Company's operations over the years reflect a corporate organization and operation in the conventional sense. The relations between defendant and its shareholders were, from the beginning, carried on in a manner usual for a corporation acting not as a trustee or agent but as an independent corporate entity, that is, as a principal. The trial court found that defendant obtained its water rights from different sources. Some were obtained by deed, some by purchasing stock in other water companies, others by exchanging water rights and privileges. Defendant also obtained water by digging wells. Significantly, the record bears out the finding of the trial court that of the 2,300 inches of water now owned and controlled by defendant, over 1,000 inches were developed after 1900 and were never owned by plaintiffs' predecessors in interest. The trial court also found that all of the water rights obtained by defendant were conveyed or transferred to it for a valuable consideration, a persuasive finding which is incompatible with plaintiffs' contention that the grantors of the water rights conveyed no title to defendant but that each merely exchanged muniments of his own title.

We conclude that the shareholders of defendant do not own the water rights and the facilities of the corporation but, rather, that they own a right to have water delivered to their properties, a right that is appurtenant to the land. Therefore the trial court correctly decided against plaintiffs in their action to quiet title to a portion of defendant's property, including water rights.

■ It follows that the trial court also properly denied plaintiffs' request for an injunction prohibiting defendant from entering into negotiations to settle the pending action by which the City of Riverside is condemning defendant's property. The trial court's denial of an injunction is given additional support by the fact that plaintiffs' right to receive water from any successor of defendant is not threatened.

■ Plaintiffs concede this to be the fact, since in their opening brief they state: "The established rule is that a successor operator of a water company takes the system subject to all existing burdens. This is true whether the transfer is voluntary or by way of condemnation; whether preexisting water service is under private rights or under the law of public service; and whether the successor is a private entity, public utility, or governmental agency [citations]."

We agree with this assertion of plaintiffs, which they support by 11 citations of authority.

Turning to plaintiffs' cause of action for declaratory relief, two questions confront us: First, what is the status of a shareholder of a mutual water company as compared with shareholders of corporations in general and, second, how can an individual shareholder protect his right to receive water if the water company is condemned? ■ The first question is answered by the Supreme Court in *Consolidated People's Ditch Co.* v. *Foothill Ditch Co.*, 205 Cal. 54, at page 63 [269 P. 915]: "The term 'Mutual Water Company,' much stressed by the appellants herein as defining these several corporations, has no defined legal meaning which would serve to differentiate corporations, organized for the acquiring of water rights and the distribution of water, from other corporations owning and administering property for the benefit of their stockholders, *nor have the stockholders in that class of corporations any other or further rights than have those of corporations in general with respect to the administration of the affairs and properties of the corporation.* ■ The stockholders in corporations organized chiefly for the purpose of acquiring and distributing water have, it is true, a definite right to their proportion of the distribution of such water when so acquired, and the cases are uniform to the effect that they may individually enforce that right by appropriate proceedings in the event of its evasion or denial on the part of the officers of the corporation." (Italics added.)

■ The answer to the second question, how the shareholder can protect himself, is found in a series of three cases decided by the Supreme Court, *South Pasadena* v. *Pasadena Land & Water Co.*, 152 Cal. 579 [93 P. 490]; *Graham* v. *Pasadena Land & Water Co.*, 152 Cal. 596 [93 P. 498]; and *Orcutt* v. *Pasadena Land & Water Co.*, 152 Cal. 599 [93 P. 497]. All of these cases are cited by plaintiffs in support of their concession that a successor operator of a water company takes the system subject to all existing burdens. The *Pasadena Land & Water Co.* cases determined that if there should be an attempt by a water company's successor in interest to cut off the supply of water to which a shareholder or user is entitled, the injured person has a remedy by a suit in mandamus. Further, that since there is an adequate remedy at law, a suit in equity to enjoin the threatened transfer cannot be maintained.

We come now to the cause of action which alleges that the acts of defendant are ultra vires. As to plaintiffs' contention that the directors are attempting to convey or to facilitate the condemnation of property defendant does not own, we recur to our earlier determination that plaintiffs-shareholders do not own the water rights or other property to which defendant holds title; rather, defendant owns the water rights, while each shareholder of defendant is entitled to receive at his property the amount of water appurtenant to his land.

A word must be said, however, about plaintiffs' additional argument that the settlement agreement is ultra vires because a judgment in condemnation if entered pursuant thereto would give the City of Riverside title to defendant's assets. This, plaintiffs contend, would enlarge the service area, would permit the city to substitute water from new sources, and would create privileges and preferences in the distribution of the water, to the advantage of the City of Riverside as a shareowner, and to the disadvantage of the irrigation owners. Plaintiffs overlook that all of these results which they find objectionable, flow from the law that permits a city or a municipal water district to condemn the water rights of a private or a mutual water company. In the event of such condemnation the boundaries of the private company are no longer controlling, since the boundaries of the condemning entity control. New sources of water and different sources of water are naturally going to be available, since the condemning entity, particularly if a city, usually already owns water rights or water sources used to supply its inhabitants.

A political subdivision of the state takes a private water company that it has condemned under the power of eminent domain, unfettered by the articles of incorporation and bylaws of the company other than the obligation to continue supplying water to the shareholders.

A settlement with a condemner consistent with the rights vested in the condemner by state law, can hardly be ultra vires. Furthermore, the amicable settlement of matters in litigation is encouraged by the courts. Condemnation actions are no exception.

The judgment is affirmed.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied April 29, 1964, and appellants' petition for a hearing by the Supreme Court was denied June 3, 1964.

## APPENDIX

### The History of the Gage Canal Company

*The History of the Gage Canal From its Inception to the Formation of The Gage Canal Company.*

(a) *Operation under Mr. Gage*

In 1882, Matthew Gage filed for entry under the United States Desert Land Act of 1877 on Section 30, Township 2 South, Range 4 West, San Bernardino Base and Meridian, which lay adjacent to and immediately north of a large ravine known as the Tequesquite Arroyo. He also owned a supply of water situated some twelve miles northerly in the valley of the Santa Ana River. Mr. Gage constructed a canal from the water source lands to Section 30 during 1884 to 1886.

In order to pay for the water source lands and the canal, Mr. Gage, by various deeds and agreements, bound himself, the water source and canal system, to produce water in exchange for grants to him of the necessary land, or for cash to purchase such land. (These obligations are later referred to as the "Hunt and Cooley" and "East Riverside" rights.)

(b) *The Crewdson Agreement" of* 1889.

In the years 1888 and 1889 an extension of the canal was constructed by Matthew Gage, extending across the Tequesquite Arroyo, from the north bank of the Arroyo in a southerly direction a distance of about ten miles. In the latter year, Mr. Gage entered into an agreement with Wilson Crewdson of London, England.

The "Crewdson Agreement," dated December 13, 1889, recites that Mr. Gage owned the "Victoria Tract" (formerly the "Carit Tract") containing 2377 acres, with water rights, and a second tract of 4,794 acres known as "Arlington Heights," plus a recently constructed canal. The agreement continues, to say that a company named the Riverside Trust Company, Limited, is about to be formed to acquire and work the lands, canals and water rights owned by Mr. Gage, and to take over the rights and duties described in the agreement.

Provision is then made that Mr. Gage sell to the trust company the described lands, canal, and water rights, along with plant machinery and furniture used therewith, and the benefit of all contracts relating thereto. The trust company in turn would undertake to perform the obligation of Mr. Gage under two contracts for the sale of water, one being the

"East Riverside" right and the second being the "Hunt
and Cooley" right. The agreement stated that after January
1, 1890, Mr. Gage would be deemed to be carrying on busi-
ness on behalf of the trust company. The agreement then
permitted that an "American Company" be formed to take
title to such property as the trust company considered desir-
able, Mr. Gage to be managing director likewise of the
"American Company."

(c) *The Formation of the Riverside Trust Company, Limited*

The Riverside Trust Company, Limited, was formed in
London, England, contemporaneously with the execution of
the "Crewdson Agreement," and the articles provided that
it was to adopt and carry that agreement into effect. The
articles included the stated objective to promote an "Ameri-
can Company," or to appoint any person the "trustee, attor-
ney or agent" of the trust company to arrange for manage-
ment of the affairs of the trust company in America.

(d) *The Deed of* 1890.

In March, 1890, Matthew Gage conveyed to the Riverside
Trust Company, Limited, the water source lands along the
Santa Ana River (the "Carit" or "Victoria" Tract), the
land some miles to the south of the water source lands and
south of the Tequesquite Arroyo ("Arlington Heights"),
and the canal linking the two tracts. The deed included Mr.
Gage's right to take water from the Santa Ana River, sub-
ject to outstanding grants of water or water rights.

### The Formation of The Gage Canal Company

The Gage Canal Company was incorporated in November,
1890. The original articles stated the basic purpose "To pro-
cure in exchange for shares in the Company water and water
rights and a right of flowage for the same in and from the
Gage Canal ... such waters and water rights to belong only
to the stockholders or to the corporation for distribution and
allotment to its sotckholders and to be used for such purposes
only as may be endorsed on the share certificate of the stock
representing the same, and such water to be supplied to the
stockholders without profit to the Company, and also for the
purposes (in aid of such first named purpose)," including
those as follows: To contract with the Riverside Trust Com-
pany, Limited, in relation to water and water rights in the
water source lands along the Santa Ana River; to acquire an
easement for the flowage of such water in the Gage Canal;
"to use and dispose of and supply such water or water rights

or privileges to the stockholders of this corporation ...''; to undertake obligations to other lands having vested water rights in the Gage Canal system; to provide that a share in the company carry an entitlement of one inch of water under a four inch pressure for every ten shares.

The articles included that all shares shall be the same in every respect, shall be proportionately taxed for maintenance costs, and shall be subject to the articles and by-laws of the company.

Matthew Gage and Wilson Crewdson were named among the original directors of the new company.

### The Years Between 1890 and 1910.

(a) *The "Easement in the Canal"*

In 1891, the Riverside Trust Company, Limited, conveyed an easement for the flowage of water in the canal to The Gage Canal Company.

At the same time the canal company agreed to purchase water from the trust company by giving shares in the canal company "with water right attached and issued to said Trust Company, or order, at the rate of ten shares for each inch of water ... so sold." The trust company agreed that the amount of water sold "shall be a first lien" on the water sources conveyed by Matthew Gage to the trust company. It was also agreed that, after the trust company had supplied as much water as it desired, the canal system would be quit-claimed by the trust company to the canal company.

(b) *The "Deeds to Water"*

A "Deed to Water" was given in 1892 by the Riverside Trust Company, Limited, to The Gage Canal Company, in the amount of 1,000 inches under a four inch pressure.

The trust company reported to the canal company that 1,000 inches of water was flowing or ready to flow at the headgates of the canal. In exchange for the deed of water the canal company issued 10,000 shares of its stock to the trust company.

In 1903, the trust company in exchange for 1,968 shares in the canal company, conveyed to the canal company 196.82 inches of water, the deed describing them as "water and water rights in the Gage Canal ... The said water and water rights being those received by [The Riverside Trust Company, Limited] from the hereinafter named grantors by deeds duly recorded upon the records of the hereinafter named Counties, upon the book and page hereinafter named,

and covering the specific amounts of water, measured under a four inch pressure hereinafter set forth, to wit: ...'' The deed went on to recite the names of numerous grantors, recording data for 26 deeds in Riverside County and two deeds in San Bernardino County, and specifying the flow of water involved in each deed, in amounts ranging from 50 inches to less than one inch.

A similar deed was given by the trust company to the canal company in 1909, being (in exchange for 280 shares) the ''water and water rights in the Gage Canal, lying within the Counties of San Bernardino and Riverside, in the State of California, and amounting in all to twenty-eight (28) inches of water measured under a four inch pressure. The said water and water rights being those received by [The Riverside Trust Company, Limited] from the hereinafter named grantors by deeds duly recorded upon the records of the County of Riverside, State of California, upon the book and page hereinafter named, and covering the specific amounts of water, measured under a four inch pressure, hereinafter set forth, to wit: ...'' The deeds referred to were recorded in Riverside County between the years 1904 and 1909.

(c) *The Lands of Arlington Heights are Sold.*

Between 1892 and 1909, the lands of Arlington Heights were sold to individuals by The Riverside Trust Company, Limited. When the trust company conveyed a parcel of land, it would also transfer shares in The Gage Canal Company on the basis of two shares for every acre in the parcel sold. The shares became appurtenant to the land described in each case on the certificate, and entitled the owners to a flow of .1 inches of water per share. A lump sum was charged for the land and the accompanying water shares.

The transactions among the canal company, the trust company and purchasers from the trust company involving shares in the canal company, were handled as follows:

The canal company kept a share register for the trust company. Upon receiving the first deed to water, the canal company issued a certificate to the trust company for 10,000 shares.

· When the trust company made its first sale of land, it returned the certificate for 10,000 shares to the canal company. The canal company (1) cancelled the trust company certificate; (2) issued as many new shares from the regular share register in the name of the land purchaser as were

called for in the deed the purchaser had received from the trust company, and (3) issued a new certificate to the trust company from the register for the original number of shares less the number of shares just issued to the purchaser.

When the trust company gave the canal company further deeds to water, a new certificate was issued to the trust company to show the increased number of shares given in exchange therefor. Whenever land was sold by the trust company, the transaction described in the paragraph above was repeated until the trust company had disposed of all its shares in the canal company in this manner.

(d) *The Deed of 1910.*

In March 1910, The Riverside Trust Company, Limited, conveyed the water sources and the canal to The Gage Canal Company, and the canal company agreed to carry out the obligations of the trust company in regard thereto.

At the same time the deed was given, the trust company entered into a contract with the canal company which included these provisions: That the canal company has the right to take from the water source lands, in addition to the 1224.8 inches of water deeded to it, an additional 200 inches, "but not for sale, rental or distribution to other parties," plus other water necessary to satisfy the rights of others under deeds or contracts of Matthew Gage or the trust company; that the canal company has no other right to take water from the water source lands except by the contract with the trust company; and that excess flowage rights in the Gage Canal are reserved to the trust company.

### Three Final "Deeds to Water"

Two additional "deeds to water" were given by The Riverside Trust Company, Limited, to The Gage Canal Company in exchange for shares in the canal company.

One, dated September 1909, was given in exchange for ten shares, being for "One (1) inch of water in the Gage Canal, together with the right of flowage therefor in said canal, said water and water right being that conveyed to the Riverside Trust Company, Limited, heretofore by C. E. Rumsey and wife. . . ."

A second deed, dated February, 1911, included similar recitations, except for the names of the original grantors, and except that the deed exchanged twenty shares in the canal company for two inches of water.

A final deed to water was given in 1924, whereby J. F.

Walin exchanged for ten shares in the canal company a right to water originally conveyed by Matthew Gage as a "water right in the Gage Canal System" being the flow of one inch, the pre-existing right being described as 'substantially equivalent to the right to water represented by ten shares of the capital stock of said Gage Canal Company.' "

### Development of New Water Sources.

(a) *New Sources: 1910 to 1955*

The original water supply for the canal system was from the water source lands along the Santa Ana River. The Gage Canal Company takes 2,300 inches of water from the source, which is comprised of the water deeded to The Gage Canal Company, the "Hunt and Cooley" right to 159.2 inches, and the "East Riverside" rights to 696.88 inches.

After the shares originally issued to The Riverside Trust Company, Limited, were sold along with land on the basis of two shares to the acre, it appeared that the flow of .1 inch per share was inadequate to irrigate the citrus groves as the trees grew larger. The canal company increased the water supply available to its shareowners in several ways. Between 1913 and 1920, the canal company acquired five-sevenths of the original "Hunt and Cooley" right, giving the canal company an additional 113.7 inches of water, leaving "Hunt and Cooley" with 45.5 inches. In 1923, the canal company developed the DeBerry Street well, which produces 170 inches of water. In 1926, The Gage Canal Company developed the Olivewood Avenue wells, which produce 470 inches of water. The Gage Canal Company also acquired 100 inches of water by contract with The Riverside Water Company. This additional supply of water was allocated to the 12,278 shares issued by The Gage Canal Company and located on 6,139 acres of land; except that in 1926, after the Olivewood Avenue wells were developed The Gage Canal Company issued 500 shares covering an additional 250 acres.

Of the 500 shares issued in 1926, two were acquired by a predecessor in interest to the appellant R. F. Irving and one by a predecessor of appellant R. S. Malloch. Otherwise, the chain of title to plaintiffs' shares go back to those originally issued to the trust company, and their title to land in the Arlington Heights area includes land originally owned by Matthew Gage and conveyed by him to the trust company.

The company continues to furnish water to approximately 6,400 acres of irrigated farm lands, an area roughly equal to that irrigated in 1927.

(b) *New Sources: Since 1955.*

The Gage Canal Company was engaged exclusively in irrigation operations until 1956. At that time, the canal company acquired 450 shares in The East Riverside Water Company, making available a flow of 90 inches of water. Against this flow, the canal company issued 600 shares in the canal company to the City of Riverside. The city takes the water to which it is entitled as a shareowner in the canal company from the well-heads at the water source lands along the Santa Ana River. Also in 1956, the canal company issued 667 shares to the California Electric Power Company, covering a new extraction of 100 inches of water which is used by the California Electric Power Company in its cooling towers in a generating plant overlying water source lands along the Santa Ana River.

(c) *1955 Amendments to Articles.*

Prior to the share issue of 1956, The Gage Canal Company amended its articles of incorporation with the following principle objectives, as they were set forth at that time by the president of the company: Elimination of obsolete references to The Riverside Trust Company, Limited; provision for special rates for non-irrigation water; specification that the water entitlement is one and one-half inches per ten shares.

(d) *"Extra Water."*

In 1956, The Gage Canal Company also exchanged its old form of share certificate for a new form, which expressly provides for an entitlement of .15 inches of water per share. After the 14,055 shares outstanding are multiplied by .15 inches of water, there is still a flow left over of about 350 inches. This "extra water" is divided among the shareowners, who order "extra water" as needed for the citrus groves. The canal company treats all irrigation shareowners alike in regard to this supply of "extra water."

A petition for a rehearing was denied April 29, 1964, and appellants' petition for a hearing by the Supreme Court was denied June 3, 1964.