[Civ. No. 10026. Fourth Dist., Div. Two. Dec. 21, 1971.]

CUCAMONGA COUNTY WATER DISTRICT, Plaintiff and Appellant, v.
SOUTHWEST WATER COMPANY et al., Defendants and Respondents.

250

COUNSEL

Rutan & Tucker, Milford W. Dahl and Homer L. McCormick, Jr., for Plaintiff and Appellant.

Howard M. Downs, Stuart R. Pollak, Malcolm E. Wheeler and Howard, Prim, Smith, Rice & Downs for Defendants and Respondents.

Brobeck, Phleger & Harrison and Robert N. Lowry as Amici Curiae on behalf of Defendants and Respondents.

OPINION

GABBERT, J.—Appellant (plaintiff below) is the Cucamonga County Water District, a public entity formed under the County Water District Law. Respondents are the Southwest Water Company, a privately owned public utility water company, and Rochester Water Company, a mutual water company.

In 1957 Southwest received a certificate of public convenience and necessity to provide water service in the lightly populated Etiwanda area, located between the City of Fontana and the Cities of Upland and Ontario in western San Bernardino County. It lies in country sloping gently southward from the base of the San Gabriel Mountains.

Rochester since the turn of the century has provided water service to a narrow north-south strip of land in the Etiwanda area. Water is collected from tunnels driven into the walls of canyons in the mountains, and after being received into a reservoir flows southward to the service connections scattered along the 4-mile line of Rochester Avenue. Water pumped from a leased well supplements the mountain supply.

As part of the plan of Southwest to provide water service to this area,

and at about the same time it received its certificate of public convenience and necessity therefor, Southwest acquired virtually all the shares of stock in Rochester for $92,000, half in cash and half in Southwest shares. After acquisition of the Rochester shares, Southwest took over distribution of water to the 23 Rochester domestic services and made some improvements in the Rochester collection and distribution facilities. Southwest also proceeded to develop its own water service facilities, mostly in the northern portion of the certificated area, north and east of Rochester Avenue. By the time this proceeding had commenced, connections to the Rochester system had increased to 50-plus services.

The District annexed a part of the Southwest certificated area, which included virtually all the Rochester lines downstream from the reservoir and some Southwest lines. Having determined to install duplicating water service facilities in the annexed areas by means of a proposed Assessment District No. 5, the District commenced a proceeding to ascertain just compensation due Southwest and Rochester for any of its property employed in providing water service and made inoperative, reduced in value, or rendered useless because of the District's extensions. (Pub. Util. Code, §§ 1503, 1504.)

The parties concede that, prior to 1965, the District could have extended its water service facilities to duplicate those of Southwest and Rochester without paying compensation to Southwest or Rochester for such injuries. (*Clark* v. *City of Los Angeles,* 160 Cal. 30, 40 [116 P. 722]; *Madera Waterworks* v. *City of Madera,* 228 U.S. 454, 456-457 [57 L.Ed. 915, 916, 33 S.Ct. 571].) In 1965, however, the Legislature added chapter 8.5 to the Public Utilities Act,[1] finding that the potential loss

---

[1]Chapter 8.5 reads as follows:
"1501. The Legislature recognizes the substantial obligation undertaken by a privately owned public utility which is franchised under the Constitution or by a certificate of public convenience and necessity to provide water service in that the utility must provide facilities to meet the present and prospective needs of those in its service area who may request service. At the same time, the rates that may be charged for water service by a regulated utility are fixed by the Public Utilities Commission at levels which assume that the facilities so installed will remain used and useful in the operation of the utility for a period of time measured by the physical life of such facilities.
"The Legislature finds and declares that the potential loss of value of such facilities which may result from the construction and operation by a political subdivision of similar or duplicating facilities in the service area of such a private utility often deters such private utility from obtaining a certificate or extending its facilities to provide in many areas a water supply essential to the health and safety of the citizens thereof.
"The Legislature further finds and declares that it is necessary for the public health, safety, and welfare that privately owned public utilities regulated by the state be compensated for damages that they may suffer by reason of political sub-

of value to privately owned public utilities and mutual water companies of water service facilities duplicated by political subdivisions deters the extension of such privately owned facilities to provide essential water supply. The Legislature further found that public necessity required that compensation be paid by political subdivisions for damage attending the extension of duplicating facilities (Pub. Util. Code, §§ 1501, 1506), and

divisions extending their facilities into the service areas of such privately owned public utilities.

"1502. (a) As used in this chapter, 'political subdivision' means a county, city and county, city, municipal water district, county water district, irrigation district, public utility district, or any other public corporation.

"(b) As used in this chapter, 'service area' means an area served by a privately owned public utility in which the facilities have been dedicated to public use and in which territory the utility is required to render service to the public.

"(c) As used in this chapter, 'operating system' means an integrated water system for the supply of water to a service area of a privately owned public utility.

"(d) As used in this chapter, 'private utility' means a privately owned public utility providing a water service.

"(e) As used in this chapter, 'type of service' means, among other things, domestic, commercial, industrial, fire protection, wholesale, or irrigation service.

"1503. The Legislature finds and declares that whenever a political subdivision constructs facilities to provide or extend water service, or provides or extends such service, to any service area of a private utility with the same type of service, such an act constitutes a taking of the property of the private utility for a public purpose to the extent that the private utility is injured by reason of any of its property employed in providing the water service being made inoperative, reduced in value or rendered useless to the private utility for the purpose of providing water service to the service area, and such taking shall be compensable under Section 14 of Article I of the Constitution of California.

"1504. Just compensation for the property so taken for public purposes shall be as may be mutually agreed by the political subdivision and the private utility or as ascertained and fixed by a court of competent jurisdiction pursuant to the laws of this state relating to eminent domain, including consideration of the useful value to the political subdivision of the property so taken.

"Whenever the compensation by a political subdivision under this section is an amount equal to the just compensation value of all the property of the private utility in the operating system that the private utility employs in providing water service to the service area, the political subdivision may, by resolution, provide for the acquisition of all such property.

"A political subdivision engaged in activities set forth in Section 1503 shall pay just compensation for the property so taken for public purposes.

"1505. The provisions of Section 1503 and 1504 will be applicable to any private utility which constructs facilities to provide or extend water service or provides or extends such service to any territory theretofore served by a political subdivision with the same type of service.

"1506. As used in this chapter, 'private utility' includes a mutual water company. In its application to mutual water companies, this chapter affects and relates only to the property, or portion of any property, of a mutual water company that is employed by the company in providing water service in or for a territory that is actually being provided with water service by the company when a political subdivision constructs facilities to provide or extend water service or provides or extends such service to the territory, and that territory shall constitute the 'service area' of a mutual water company as used in Section 1502."

that such extension constituted, *pro tanto*, a taking of the affected property of the public utility. (§ 1503.)

The issue of the amount of just compensation was tried before a jury, and the District appeals from a judgment in favor of Rochester for $244,400, and in favor of Southwest for $40,000.

The opening brief of appellant District lists contentions on appeal under 12 general headings. However, the effective disposition of the case features the first and twelfth points of contention, namely the assertion by the District that chapter 8.5 of the Public Utilities Act is unconstitutional, or alternatively, that, if compensation is to be paid under chapter 8.5, the judgment should provide for the condemnation of the Rochester operating system to the use of the District. We set forth below the specifics of our decision that the statute passes the test of constitutionality, but that the District must prevail in its claim for title to Rochester's operating system.

The latter point will be considered first.

The judgment condemns to the use of the District all of the property of Southwest within proposed Improvement District No. 5. The judgment does not condemn any property of Rochester, providing merely that when the District has paid over $244,400, the District "shall have paid all compensation due or payable to [Rochester] under the provisions of [chapter 8.5 of the Public Utilities Act] by reason of [the District's] proposed construction." As will be demonstrated, the judgment misreads the verdict of the jury.

Section 1504 provides, in part: "Whenever the compensation by a political subdivision under this section is an amount equal to the just compensation value of all the property of the private utility in the operating system that the private utility employs in providing water service to the service area, the political subdivision may, by resolution, provide for the acquisition of all such property."

A resolution of the District board of directors was set forth in the pleadings and put in evidence, which recited that, in the event the compensation required to be paid by the District is an amount equal to the just compensation value of all the property of the Rochester operating system employed in providing water service within proposed Assessment District No. 5, public interest and necessity require that such property be acquired for public use. The verdict of the jury was in two parts: In the first part the jury found that the fair market value of the property employed by Rochester in providing water service within proposed Assessment District No. 5 was $249,000; and in the second part the jury found that the damages suffered by Rochester as a result of being injured by reason

of any of its property employed in providing water service being rendered inoperative, reduced in value or rendered useless was $244,400. When reference is made to the record, the proper construction of the verdict is that the proposed construction by the District rendered the Rochester system valueless, except for the incidental salvage of some removable items.

The theory relied on by Rochester at the trial was that the construction proposed by the District rendered the Rochester system valueless except for incidental salvage of some removable items. The values given by the District nowhere approach the amount of the verdict, and accordingly there is substantial evidence to support the values given in the verdict only if it is considered that the jury accepted as true Rochester's theory of the case.[2] Turning to the evidence, Walker Hannon testified for Rochester that "after the take" the water rights, facilities upstream of the reservoir, the reservoir, and downstream distribution lines would be worth nothing, and that the only value remaining would be the salvage of "two pressure reducers" and "eight four inch fire hydrants," worth an estimated $500. The second witness for Rochester was Thomas M. Stetson who testified that after the construction of the parallel system by the District, the only things of any value left to Rochester were "about two hundred dollars worth of salvage for the chlorinator," and three thousand dollars worth of salvage for "some of the hydrants and main meters."

■ The verdict should be liberally construed to uphold the judgment. (*Clark* v. *McClurg,* 215 Cal. 279, 285 [4 P.2d 149, 9 P.2d 505, 81 A.L.R. 908]; Cal. Const., art. VI, section 13.) Although it falls to the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence, and instructions, where the trial court does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation. (*Woodcock* v. *Fontana Scaffolding & Equip. Co.,* 69 Cal.2d 452, 456-457 [72 Cal.Rptr. 217, 445 P.2d 881].)

[2]Summary of Walker Hannon (for Rochester):

| Item | "Before" | "After" | "Damages" |
| --- | --- | --- | --- |
| Water Rights | $280,000 | 0 | $280,000 |
| Reservoir | 25,000 | 0 | 25,000 |
| Trans. & Dist. Facilities | 41,500 | 500 | 41,000 |
| Summary of Thomas A. Stetson (for Rochester): | | | |
| Water Rights | 161,429 | 0 | 161,429 |
| Reservoir | 24,508 | 200 | 24,308 |
| Dist. Facilities | 82,489 | 3,000 | 79,489 |
| Summary of Winfried Langer (for the District): | | | |
| Water Rights | 15,000 | 11,000 | 4,000 |
| Easement | 5,000 | 500 | 4,500 |
| Dist. Facilities (Includes Reservoir) | 63,500 | 4,000 | 59,500 |
| Reservoir Site | 1,500 | 500 | 1,000 |

From the foregoing, the proper construction to be given the verdict is that when Rochester is paid the $249,000 it will have received the just compensation value of all the property of the private utility in the operating system that the private utility employs in providing water service to the service area, and the District is entitled to have the Rochester system condemned to its use. The modified judgment will include payment for the items described by Rochester as "salvage"; these items · are a necessary part of the operating system, which is taken over by the District subject to all existing burdens of water service. (*Erwin* v. *Gage Canal Co.,* 226 Cal.App.2d 189, 194 [37 Cal.Rptr. 901].)

It is, therefore, necessary to reverse and remand for the purpose of the preparation of new findings of fact, conclusions of law and a new judgment consistent with the opinion herein expressed. On remand the trial court shall modify the judgment to provide that the fair market value of the Rochester system is $249,000, and that upon payment of such sum into court for the benefit of Rochester, there shall be condemned to the use of the District all of the property employed by Rochester in providing water service to that portion of the service area designated as proposed Assessment District No. 5. The extent of these facilities is more particularly considered below.

Turning to the constitutional questions, the District did not raise the issue of the constitutionality of chapter 8.5 of the Public Utilities Act in the trial court. ■ It is a general rule applicable in civil cases that a constitutional question must be raised at the earliest opportunity or it will be considered as waived. (*Hershey* v. *Reclamation District No. 108,* 200 Cal. 550, 564 [254 P. 542]; *Jenner* v. *City Council,* 164 Cal.App.2d 490, 498 [331 P.2d 176].) However, whether the rule ought to be applied is largely within the appellate court's discretion. (*Bayside Timber Co.* v. *Board of Supervisors,* 20 Cal.App.3d 1, 4-5 [97 Cal.Rptr. 431].) The parties and amicus curiae have fully briefed the matter. In view of the public importance of the question we will proceed to consider the constitutional contentions made by the District.

■ The District argues that chapter 8.5 of the Public Utilities Act "will narrow, impede, limit and embarrass article XI, section 19 [of the California Constitution] and, further will frustrate the whole purpose of that constitutional provision." The constitutional provision[3] reads, in part as follows: "Any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transpor-

---

[3]This section was repealed and replaced by new section numbered 9 at the election of June 2, 1970, without apparent substantive change, so far as applicable to the within case.

tation, telephone service or other means of communication. Such works may be acquired by original construction or by the purchase of existing works, including their franchises, or both." The essence of the District's argument is that the quoted provision of the Constitution renders the Legislature powerless to limit or impair by the particular means selected the right of a county water district to establish public works to furnish its inhabitants with water. The reply to the argument is that the legislative power of this state is vested in the California Legislature, except for the reserved powers of popular initiative and referendum. (Cal. Const., art. IV, § 1.) ". . . our Constitution is not a grant of power but rather a limitation or restriction upon the powers of the Legislature (*In re Madera Irr. Dist.*, 92 Cal. 296 [28 P. 272, 675, 29 Am.St.Rep. 106, 14 L.R.A. 755]; *Macmillan Co.* v. *Clarke*, 184 Cal. 491 [194 P. 1030, 17 A.L.R. 288]; *People* ex rel. *Smith* v. *Judge of the Twelfth District*, 17 Cal. 547; *Sheehan* v. *Scott*, 145 Cal. 684 [79 P. 350]; *Fitts* v. *Superior Court*, 6 Cal.2d. 230 [57 P.2d 510]; *Mitchell* v. *Winnek*, 117 Cal. 520 [49 P. 579]) and 'that we do not look to the Constitution to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited.' (*Fitts* v. *Superior Court, supra.*) If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations are to be construed strictly, and are not to be extended to include matters not covered by the language used." (*Collins* v. *Riley*, 24 Cal.2d 912, 916 [152 P.2d 167].) A constitutional provision which specifies that a municipal corporation may provide water service does not prohibit the Legislature from taking action which touches upon such function. By way of example, we held in *Glenbrook Development Co.* v. *City of Brea*, 253 Cal.App.2d 267, 273-275 [61 Cal.Rptr. 189], that section 31053 of the Water Code[4]

---

[4]Section 31053 reads as follows: "No publicly owned utility shall commence to provide any service for, on, or to any land within a county water district which is subject to the lien of a general obligation bonded indebtedness incurred by the district for the purpose of providing a service similar to that which the utility proposes to provide.

"However, a publicly owned utility may commence to provide service, otherwise prohibited, upon either of the following conditions:

"(a) If the board of directors of such a county water district shall by resolution permit such service; or

"(b) In any portion of such a county water district proposed to be served by the publicly owned utility in which the total number of registered voters residing therein exceeds 200, and in which at least two-thirds of the voters shall have voted at a special county water district election to permit such service. The election shall be called and held as an initiative measure pursuant to Section 30830. (Added Stats. 1959, ch. 2076, p. 4807, § 1.)"

which conditionally prohibits a city from providing water service to land within the city does not offend the constitutional provision invoked by the District.[5] As to the legislation under attack, it does not go so far as to forbid that the District establish and operate public works for supplying its inhabitants or any number thereof with water, but only that when the District extends its facilities into the service area of a privately owned public utility it compensate the utility for damages suffered thereby. The Legislature has found and declared that such an arrangement is necessary for the public health, safety and welfare. (Pub. Util. Code, §1501.) Such finding is entitled to great weight and it is not the duty or the prerogative of the courts to interfere with such legislative findings unless it clearly appears to be erroneous and without reasonable foundation. (*The Housing Authority* v. *Dockweiler*, 14 Cal.2d 437, 449-450 [94 P.2d 794].) Article XI, section 19 of the Constitution does not forbid such legislation as chapter 8.5 of the Public Utilities Act.

The District also argues that chapter 8.5 of the Public Utilities Act is unconstitutional in that it denies the District equal protection of the laws and constitutes an invalid grant of a special privilege, citing the Fourteenth Amendment to the United States Constitution and article I, sections 11 and 21, and article IV, former sections 25 and 33 (now § 16) of the California Constitution. Although stated in several ways, the objection is substantially that the legislation is faulted as resting upon an unreasonable classification, being concerned with the duplication of water service facilities only, rather than all public service facilities. The familiar rule to be applied is that the authority and duty to ascertain the facts which will justify class legislation lies with the Legislature and not with the courts; that the Legislature is vested with wide discretion in adopting classifications to which any particular statute is made applicable; and that when a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles*, 60 Cal.2d 276, 288-289 [32 Cal.Rptr. 830, 384 P.2d 158]; *Sacramento M. U. Dist.* v. *P. G. & E. Co.*, 20 Cal.2d 684, 693 [128 P.2d 529], cert. den. 318 U.S. 759 [87 L.Ed. 1132, 63 S.Ct. 530].) Although chapter 8.5 of the Public Utilities Act singles out the duplication of water service facilities as the object of

---

[5]The following appears in the brief of amicus curiae: "The holding in the *Glenbrook* case that a water district is a municipal corporation was not essential to the determination of the issues stated to be involved therein, and is contrary to the manifest purpose of Article XI, Section 19. Under the circumstances, the court should hold that appellant is not a municipal corporation within the meaning of Article XI, Section 19, of the State Constitution. Since appellant is not a municipal corporation, it has no standing to assert that the Service Duplication Law is in conflict with this provision of the Constitution." We decline to consider the question since the outcome of the case would be unaffected thereby.

its consideration, the Legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be most evident. (*Board of Education* v. *Watson,* 63 Cal.2d 829, 833 [48 Cal. Rptr. 481, 409 P.2d 481].) The special importance attached to efficient and economical use and distribution of water in the arid western states, and the provision of the California Constitution that the use of all water is subject to regulation by the state (Cal. Const., art. XIV) justifies the classification under consideration here.

The District's next contention is that chapter 8.5 of the Public Utilities Act should be construed to provide compensation only for water service facilities constructed by privately owned public utilities and mutual water companies after the effective date of the legislation, and that to do otherwise would violate article XIII, section 25, of the California Constitution, which prohibits the making of a gift of public funds. The plain language of the legislation does not permit such a distinction to be made. Section 1503 reads: "The Legislature finds and declares that whenever a political subdivision constructs facilities to provide or extend water service, or provides or extends such service, to any service area of a private utility with the same type of service, such an act constitutes a taking of the property of the private utility for a public purpose to the extent that the private utility is injured by reason of any of its property employed in providing the water service being made inoperative, reduced in value or rendered useless to the private utility for the purpose of providing water service to the service area, and such taking shall be compensable under Section 14 of Article I of the Constitution of California."

Where language is plain and unambiguous there exists no room for construction. (*Lockhart* v. *Wolden,* 17 Cal.2d 628, 631 [111 P.2d 319]; *Caminetti* v. *Pac. Mutual L. Ins. Co.,* 22 Cal.2d 344, 353 [139 P.2d 908], cert. den. 320 U.S. 802 [88 L.Ed. 484, 64 S.Ct. 428]; *Ruiz* v. *Industrial Acc. Com.,* 45 Cal.2d 409, 414 [289 P.2d 229].) Chapter 8.5 covers "any service area of a private utility with the same type of service" and "any of its property employed in providing the water service"; there is no room for judicial gloss. The statute does not authorize a gift of public funds: Although the District complains that it would receive nothing in exchange for the payment to Rochester, as already indicated, the modified judgment will provide for condemnation of the Rochester system to the use of the District, which eliminates the basis of the objection.

A further contention made by the District is that no compensation is payable under article I, section 14 of the California Constitution for

damages caused by competition arising out of duplication of utility services. The modification of the judgment likewise disposes of this contention. Article I, section 14 provides in part, that "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner. . . ." The District considers that no compensation is due under the Constitution "for the damages resulting to a private corporation by competition by a public entity" and that as to the particular case ". . . there is no taking in the literal sense . . . unless damages equal the full market value of the system duplicated." Again, however, the modified judgment will provide for a taking of all the property affected at the market value as determined by the jury, all of which was anticipated by the original resolution of the board of directors of the District, as already noted. ▉ As to the first voiced objection concerning the validity of the legislation as it relates to an award of damages, the issue is not reached, in deference to the rule that the courts will not give their consideration to questions as to the constitutionality of a statute unless such consideration is necessary to the determination of the controversy between the litigants in the particular case before it. (*People* v. *Perry*, 212 Cal. 186, 193 [298 P. 19, 76 A.L.R. 1331]; *Franklin Life Ins. Co.* v. *State Board of Equalization*, 63 Cal.2d 222, 227 [45 Cal.Rptr. 869, 404 P.2d 477].)

The District urges two other constitutional propositions. One is that chapter 8.5 of the Public Utilities Act violates the provision that the Legislature shall not delegate to any private corporation the power to control or interfere with any municipal improvement. (Cal. Const., art. XI, §13, as effective until deleted at election of June 2, 1970.) The second is that the apparent legislative attempt to make chapter 8.5 of the Public Utilities Act a "two way street" so as to allow damages to the public in the event of duplication of public facilities by private entities cannot be achieved by the legislation. The former contention is without merit, and the latter contention is not included within the issues of the case.

The remaining contentions are considered serially below.

The second and third contentions made by the District criticize that part of the judgment which would compel the District to make payment for damages before the parallel construction is actually completed. However, since as we have determined the judgment must be modified, the property is condemned to the use of the District, and the case falls within the literal terms of the constitution that "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner . . ." (Cal. Const., art. I, § 14.)

By its fourth contention the District urges that it was error for the trial court to allow damages for property of respondents that did not constitute "facilities," specifically, "that the right of defendant Rochester to just compensation did not include compensation for purported damage to water rights, easements and such intangibles as loss of business." The last of these three items is covered later when the testimony of Thomas M. Stetson is considered further. The nature of the water rights and the effect of this proceeding thereon is also noted below. As to the inclusion in damages of the value of the easement, the District itself presented evidence and tendered an instruction to the jury that the easement owned by Rochester is a part of the property employed in providing water service to the service area. Assuming, arguendo, that error occurred, the District is foreclosed by the doctrine of invited error from arguing a contrary position on appeal. (*Jentick* v. *Pacific Gas & Elec. Co.,* 18 Cal.2d 117, 121 [114 P.2d 343].)

Some further discussion of the easement is necessary.

In 1889 Rochester received a deed from the original land developers, the first part of which covered the five mountain sections where the water is captured. As to those five sections, the deed grants to Rochester "all of the water, water rights, springs, cienegas, wells, brooks, tunnels, dams, ditches, acqueducts, pipes, reservoirs, and all the water that flows or that can be developed [thereon]; and the full right and right of way over, through and upon said land for boring, digging, constructing, repairing and maintaining wells, tunnels, ditches, dams, acqueducts and reservoirs, and laying pipes and acqueducts for conveyance of water, and the free right to enter upon said land and make said improvements and for inspecting, repairing, replacing and controlling the same."

The deed operated to prevent the grantor from complaining of a diversion by Rochester of water from the five sections (*Gould* v. *Stafford,* 91 Cal. 146, 155 [27 P. 543]; *Roberts* v. *Krafts,* 141 Cal. 20, 27 [74 P. 281]; *Duckworth* v. *Watsonville Water & Light Company,* 150 Cal. 520, 526 [89 P. 338]; *Duckworth* v. *Watsonville Water & Light Company,* 158 Cal. 206, 213 [110 P. 927]; *Duckworth* v. *Watsonville Water & Light Company,* 170 Cal. 425, 433-434 [150 P. 58]), and the rights conferred thereby are the basis of Rochester's right to the supply of water. The court found that the average annual flow from the mountain sources, adjusted for dry years, is 8 miner's inches, and that there were further undeveloped supplies of water properly included in the value of the Rochester system, concerning which more will be said later.

The second part of the 1889 deed relates to property running south of

the mountain sections, being a strip seven miles long and generally one-half section wide,[6] through the approximate center of which Rochester's lines are placed. The deed grants "all of the water pipe" in the described land "with the right of way over and through said land for laying pipes and acqueducts for conveyance of water, and the right to enter upon said land and make the necessary excavations for laying pipes and acqueducts, and to inspect, repair, replace and control the same."

The testimony of Wilfried F. Langer, a witness for the District, placed the "before" figure of the blanket easement at $5,000, and the "after" figure at $500.[7] Thus, the verdict of the jury is consistent with the District's own evidence on the issue, since the higher salvage estimate plus the remainder value of the easement approximately equals the sum which the jury found was the value of property left over to Rochester after the construction of the parallel service.

The substance of the fifth contention made by the District is that the court erred in characterizing the water rights of the Rochester system as "riparian rights" and by including the value of the "undeveloped" rights in the computation of damages. As to the first part of the contention, the District is correct: A riparian right is founded on ownership of land contiguous to the flow of the natural resource (*Lux* v. *Haggin*, 69 Cal. 255, 391 [4 P. 919, 10 P. 674]; *Gallatin* v. *Corning Irr. Co.*, 163 Cal. 405, 416 [126 P. 864]; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 375-376 [40 P.2d 486]) and neither Rochester nor its customers fit the description. However, whatever might be said about the legal label employed, no ruling of the court is shown to be in conflict with the substance of the right involved, and this court must disregard any error which does not affect the substantial rights of parties. (Code Civ. Proc., §475.) As noted already, the right conferred upon Rochester by the deed of 1889 was the right to go upon the five mountain sections and develop whatever supply of water was to be found there, unhindered by the owner of the fee. Rochester is not limited to taking an average 8-inch flow of water: It has the right to capture "all the water that flows or that can be developed" on the five mountain sections. Given substantial evidence that this opportunity to further exploit the natural resource had a present and ascertainable value, and given the testimony of Stetson to the effect that all of Rochester's rights in the water supply were rendered valueless

---

[6]The most northerly portion is a complete section. The acreage of two quarter sections is tacked on toward the southern end.

[7]Another witness for the District, Cedric A. White, valued the easement at $5,000 but gave no "after" figure. Stetson for Rochester gave no "before" figure but opined that the easement was rendered "practically valueless" by the District's construction. Testimony of Hannon as to the valuation of the easement was stricken by the court.

to Rochester as an economic consequence of the construction of the alternate system by the District, it was not error to include damages to what was referred to as "undeveloped water rights."

The District also argues, concerning the water rights, that the court erred when it permitted testimony of separate value for water rights and a separate value for the facilities to collect, divert, and transport the water. Two cases are cited by the District to emphasize the "integrated" and "inseparable" nature of water rights and the collection and distribution facilities of an operating system. *County of Tuolumne* v. *State Board of Equalization,* 206 Cal.App.2d 352 [24 Cal.Rptr. 113] is concerned with the situs of a water right for the purpose of taxation and the equalization of the assessment of the tax. *San Bernardino etc. Water Dist.* v. *Meeks & Daley Water Co.,* 226 Cal.App.2d 216 [38 Cal.Rptr. 51] forbids the condemnation of a water right at the point of diversion without assumption of existing obligations to deliver such water elsewhere. Neither case establishes the immutable rule that, as a matter of law, water rights must be valued as a unit with the facilities to collect, divert and transport the water and we do not find authority elsewhere to support the proposition. Indeed, the District's witness, Langer, expressed an opinion of value which gave a separate value for the reservoir and lines downstream thereof.

By the sixth contention it is claimed the court erred when it allowed Walker Hannon to express any opinion of value. The District correctly points out that by section 813 of the Evidence Code the value of property may be shown only by the opinions of a qualified expert or the owner. Hannon, executive vice-president of Southwest, does not fall into either category. However, the objection made in the court below was limited to Hannon's lack of qualification as an expert. When the court indicated that Hannon's testimony would be received as "managing agent of the owner" counsel for the District made no objection. To extend the language of section 813 and expand the category of "owner" to include "managing agent of the owner" is of doubtful validity. (See *City of Pleasant Hill* v. *First Baptist Church,* 1 Cal.App.3d 384, 411 [82 Cal. Rptr. 1]; 5 Nichols, Eminent Domain (3d ed.) § 18.4[2], pp. 18-117.) However, where inadmissible evidence is offered, the party who desires to raise the point of erroneous admission on appeal must object at the trial, specifically stating the grounds of his objection. (*Russell* v. *Geis,* 251 Cal.App.2d 560, 570 [59 Cal.Rptr. 569].) Failure to do so in the court below forecloses the District from presenting the question here. It is also noted that the District tendered an instruction which was given by the court, stating: *"An expert or the representative of the owner of the property being condemned* may give his opinion of such market value and damage and the reason for such opinion." [Italics

added.] This instruction demonstrates that the District acquiesced in the ruling.

The seventh contention made by the District is that the trial court erred when it refused to strike the testimony of Thomas M. Stetson. The several particular objections are covered by the preceding discussion with two exceptions. The first such objection is that Stetson was not qualified to express an opinion of value relating to the reservoir site. In that regard Stetson valued the site at $1,500, the same figure given by the District's witness Cedric A. White. The court must disregard error which does not affect the substantial rights of the parties. (Code Civ. Proc., § 475.) Secondly, the District complains that Stetson included in his opinion of fair market value of the Southwest property "consideration of the exclusive right to serve in the area." Stetson added the value of the "exclusive right to serve" was "in recognition of the growth of the area in the future." Suffice to say the District's witness, White, acknowledged that, in arriving at his opinion of value he likewise took into consideration the economic growth potential of the area. The court read to the jury the instruction tendered by appellant defining fair market value, which "presupposes that both parties are familiar with the property and its adaptability and uses." Moreover, the jury was also instructed that speculative values or injury to a business were not compensable elements of damage, and it cannot be assumed that they read into Stetson's testimony the claimed "improper considerations."

By its eighth contention the District asserts the court erred in allowing the use of "settlement documents" for purposes of cross-examination. The particular document was entitled an "Appraisal of Maintenance Equipment of Rochester Water Company" containing preliminary engineering figures prepared by Langer and used in the course of an exchange of information among the engineers. The court allowed counsel to refer to this writing in the course of efforts to impeach Langer's testimony. The District complains the effect of the writing was to show that Langer "prior to trial considered the valuation of the collecting facilities separate and apart from the valuation of the water rights." Since, on the basis of the argument already considered, there is no reason why Langer could not have done so, the error, if any, is harmless.

In its ninth contention, the District cites a number of incidents occurring during the trial which it denounces as prejudicial misconduct on the part of opposing counsel. In this regard "Each case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature, and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control of the trial,

the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (*Sabella* v. *Southern Pac. Co.,* 70 Cal.2d 311 [74 Cal.Rptr. 534, 449 P.2d 750], cert. den. 395 U.S. 960 [23 L.Ed.2d 746, 89 S.Ct. 2100].) The record has been examined and it does not reveal departures from acceptable conduct so gross as to call for reversal. In addition to admonitions given during the course of the trial, the court instructed the jury to ignore statements or insinuations of counsel and not to form any prejudice by reason of objections made at the trial.

Contention number 10 charges irregularity occurring during the deliberations of the jury, evidenced by an affidavit of the foreman to the following effect: that the bailiff was asked to convey a verbal question to the judge "whether the plaintiff would acquire title if plaintiff paid the difference between the amount determined as damages and the amount determined as fair market value"; that the bailiff did so and returned with the answer "that with respect to all of the property of Rochester Water Company involved in this action, if the Plaintiff were to pay the difference between the fair market value of that property and the damages for Plaintiff's duplication of the Rochester Water Company's system, in addition to said damages as found to exist by the jury, then the Plaintiff would acquire all of said Company's property involved in the action." Such an informal instruction would offend the provisions of section 614 of the Code of Civil Procedure. However, when the fact was presented to the trial court, a counteraffidavit of the bailiff was likewise presented denying recollection of any such incident and alleging a fixed practice "never to converse with the jury in any way concerning the issues of the action which they are considering." The record discloses that the court considered the declaration of the jury foreman as part of the record on the motion for a new trial. (Cf. *People* v. *Hutchinson,* 71 Cal.2d 342, 346 [78 Cal.Rptr. 196, 455 P.2d 132].) In resolving the conflict, the trial judge added his own remark that he had no recollection of any such question being asked of him by the bailiff. In any event, in view of the required amendment of the judgment the claimed error is not prejudicial (*Putensen* v. *Clay Adams, Inc.,* 12 Cal.App.3d 1062, 1082 [91 Cal.Rptr. 319].)

In its final contention the District asserts the trial court erred in giving, modifying, and refusing certain instructions to the jury. For the most part, the arguments presented by the District relating to the instructions duplicate the arguments made as to the underlying contentions already considered. As to the remainder, a total of over 150 proposed jury instructions were tendered to the court, and 62 were finally given. In charging the jury

the court may state to them all matters of law which it thinks necessary for their information in giving their verdict. (Code Civ. Proc., § 608.) ▇▇▇ Instructions must be considered in their entirety, and, if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though by selecting isolated passages of single instructions they may in some respects be amenable to just criticism. (*Douglas* v. *Southern Pac. Co.*, 203 Cal. 390, 396 [264 P. 237]; *Westover* v. *City of Los Angeles*, 20 Cal.2d 635, 637 [128 P.2d 350]; *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514, 519 [203 P.2d 522].) ▇▇▇ In instructing a jury it is sufficient if the court gives a well balanced statement of the essential legal principles necessary to guide them in their deliberations, and when that is done a party is not prejudiced by refusal to give an additional instruction merely because it may be said to be applicable to the case from the viewpoint of the party offering it. (*City of Los Angeles* v. *Frew*, 139 Cal.App.2d 859, 872 [294 P.2d 1073].) The Constitution forbids that a judgment be set aside on the ground of misdirection of the jury, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) In view of the foregoing it cannot be said that reversible error occurred in the course of instructing the jury.

The judgment is reversed insofar as it denies acquisition of the Rochester system to the District and the trial court is directed to make necessary findings of fact and conclusions of law and enter judgment in accordance with the views herein expressed, including that upon payment of $249,000 there shall be condemned to the use of the District all of the property employed by Rochester in providing water service to that portion of the service area designated as proposed Assessment District No. 5, being water rights arising out of and the easements conveyed to Rochester by the deed from Charles W. Smith, dated February 20, 1889, together with the collection and diversion system, reservoir and reservoir site, and transmission and distribution facilities. The judgment is otherwise affirmed.

Respondents shall recover costs, by analogy to the rule that a successful condemner must nevertheless pay the proper costs of appeal incurred in good faith. (*Sacramento Drainage Dist.* ex rel. *State Rec. Bd.* v. *Reed*, 217 Cal.App.2d 611, 612-613 [31 Cal.Rptr. 754].)

Gardner, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied January 18, 1972, and the opinion was modified to read as printed above.